WEST TEXAS UTILITIES CO.,
Appellant (Defendant),

v.

EXXON COAL USA, INC.,
Appellee (Plaintiff).

EXXON COAL USA, INC.,
Appellant (Plaintiff),

v.

WEST TEXAS UTILITIES CO.,
Appellee (Defendant).

Nos. 90–190, 90–191.

Supreme Court of Wyoming.

March 14, 1991.

Lawrence A. Yonkee of Redle, Yonkee & Toner, Sheridan, Craig Newman of Brown & Drew, Casper, Orrin Harrison III and James E. Fisher of Locke Purnell Rain Harrell, Dallas, Tex., and Roy B. Longacre of Wagstaff, Alvis, Stubbeman, Seamster & Longacre, Abilene, Tex., for West Texas Utilities Co.

Marilyn S. Kite of Holland & Hart, Cheyenne, and David J. Beck, John M. Simpson, Robert A. Burgoyne, and Richard J. Wilson of Fulbright & Jaworski, Houston, Tex., for Exxon Coal USA, Inc.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

## OPINION

MACY, Justice.

West Texas Utilities Co. appeals from the district court's ruling that Exxon Coal USA, Inc. may select either of the remedies enumerated in the parties' contract if West Texas repudiates that contract.

We affirm in part and reverse in part.

West Texas raises the following issues:

I. The District Court erred by misinterpreting the Coal Sale and Purchase Agreements (the "Contracts") to allow Exxon, upon a repudiation by [West Texas], to hold the Contract open for up to 20 years and to seek annual "Minor Breach" liquidated damages instead of "Major Breach" liquidated damages.

II. The District Court erred by misinterpreting the Contract to allow Exxon to collect annual payments under Exhibit A, Part 6, even after Exxon cancels the Contract.

III. The District Court erred by ruling that if the Minor Breach damages provision is declared to be unenforceable, then UCC § 2–708 (and not the Major Breach damages provision) would govern the measure of damages for repudiation.

IV. The District Court erred by refusing to dismiss this anticipatory suit between citizens of Texas seeking only declaratory relief concerning the proper interpretation of contracts made in Texas, in which Texas law is controlling.

West Texas, a public utility, provides electricity to consumers in the Abilene, Texas, area. Exxon, through its "operating division," Carter Mining Company, excavates coal from two open-pit mines in Campbell County, Wyoming. In 1979, West Texas decided to build two coal-fired power plants near Vernon, Texas. West Texas chose Exxon to supply the coal needed to fuel the proposed power plants. On May 15, 1981, after six months of negotiations, the parties signed a twenty-year agreement.[1]

Under the contract, West Texas agreed to purchase a minimum quantity of coal each year from Exxon's mines which were located in Wyoming. In 1986, when West Texas received its first shipment of coal, the market price for coal was lower than the price set out in the contract. Consequently, the Texas Public Utility Commission, which regulates the rates charged by West Texas to its customers, directed West Texas to "reevaluate" and report on its

---

**1.** The agreement consists of two documents entitled "Coal Sale and Purchase Agreement." Each is directed at a separate power plant. One of the plants, Oklaunion Unit No. 1, is now in operation. The other plant, Oklaunion Unit No. 2, has not been built. Unless it is necessary to distinguish between the two agreements, we will refer to them collectively as the contract.

attempts to "renegotiate, terminate, or litigate" the contract price in order to lower the cost of the coal it purchased from Exxon.

After negotiations stalled, Exxon filed this declaratory action in the district court on March 9, 1989, seeking a declaration of its remedies in the event that West Texas repudiated the contract.[2]  Both parties filed cross-motions for partial summary judgment on the issue of repudiation.  Exxon argued that it has the right, if West Texas repudiates the contract, to pursue either of the contract's liquidated damages provisions.  The contract provided for the following remedies in the event that West Texas failed to perform:

18.2  *BUYER's Failure to Perform.*

(a) *Minor Breach.*  If, in any calendar year during the term of this Agreement, BUYER fails to accept some or all of the coal for which BUYER is obligated hereunder, without excuse either by law or expressly hereunder, and with SELLER ready, willing, and able to mine and tender such coal, BUYER shall pay SELLER as liquidated damages within thirty (30) days after the end of said calendar year, for each ton of coal not taken, an amount equal to the average Price (as defined in Section 18.1(a)) applicable under this Agreement during said year, less an amount equal to the portions of the Price representing materials and supplies, power, royalty payments, and production taxes not paid.

(b) *Major Breach.*  If BUYER's default amounts to twenty per cent (20%) or more of the tonnage BUYER is required to take hereunder in any calendar year, such a default shall entitle SELLER to cancel this Agreement unless BUYER pays or tenders payment according to the preceding paragraph.  If SELLER elects to cancel for this reason, or if BUYER specifically repudiates this

Agreement, SELLER's remedy shall be an amount equal to the Price per ton applicable under this Agreement at the time SELLER cancels less an amount equal to the portion of the Price representing those costs of direct mine labor, black lung benefits, materials and supplies, power, royalty payments, and production taxes in that Price to the extent that said costs are not actually paid, multiplied by the minimum number of tons BUYER would have been required to take hereunder for the next three (3) years following SELLER's cancellation (or for the first three (3) full calendar years if performance has yet to begin when SELLER cancels).  This amount shall not be reduced to present value at time of payment and shall be in addition to the payment to which SELLER is entitled at the time of cancellation under the preceding paragraph of this Article.[3]

West Texas countered by contending that the express terms of the contract limit Exxon's remedy for West Texas' repudiation to a single liquidated damages payment under the formula detailed in section 18.2(b) of the contract.

In its decision letter granting Exxon's cross-motion for partial summary judgment, the district court ruled that, on the basis of Texas law, the parties' contract was unambiguous.  The contract provided that it "shall be governed by and construed in accordance" with Texas law.  The court interpreted the contract as being an "integrated and coherent whole" and ruled that the language of section 18.2(b) does not grant the right to West Texas to "unilaterally terminate the Contract at [West Texas'] election and thereby limit [West Texas'] liability for damages to the amounts specified in Section 18.2(b) of the Contract, unless Exxon cancels the Contract in response to a repudiation" by West Texas.  The court further stated that "the proper interpretation of Section 18.2 of the Con-

---

2.  Wyo.Stat. § 1–37–103 (1988) of the Uniform Declaratory Judgments Act provides, in part, "Any person interested under a * * * written contract * * * may have any question of construction or validity arising under the instrument determined and obtain a declaration of rights, status or other legal relations."

3.  Apparently, liquidated damages for a "minor" breach of the contract would be calculated on an annual basis, whereas payment of liquidated damages for a "major" breach would be made in a single lump sum.

tract is that, in the event [West Texas] specifically repudiates the Contract, Exxon may elect whether to cancel or seek annual liquidated damages, the alternate remedy to which the parties agreed in Section 18.-2(a)."

■ We first address West Texas' claim that the district court should have granted its motion to dismiss on the grounds of *forum non conveniens.* West Texas accuses Exxon of "forum shopping" in filing its declaratory action in Wyoming and asserts that a dispute between two Texas companies over a contract executed in Texas should be decided in Texas. Whether a case should be dismissed under the doctrine of *forum non conveniens* lies within the discretion of the district court. *Booth v. Magee Carpet Company,* 548 P.2d 1252 (Wyo.1976). The district court reviewed the arguments for and against dismissing the action and found, *inter alia,* that Exxon based its suit on rational grounds; e.g., the coal mine is located in Wyoming, and the suit was not brought for purposes of harassment. The district court did not abuse its discretion when it denied West Texas' motion to dismiss for *forum non conveniens.*

■ West Texas also asserts that Exxon's use of declaratory judgment was an improper anticipatory suit and, therefore, should have been dismissed. Wyoming's Uniform Declaratory Judgments Act recognizes, "A contract may be construed either before or after there has been a breach thereof." Wyo.Stat. § 1–37–104 (1988). The district court did not abuse its discretion in allowing this suit to proceed before West Texas breached the contract.[4]

■ West Texas makes the additional claim that the declaratory judgment did not resolve the controversy. The district court has broad latitude to decide whether declar-

atory relief is appropriate.[5] Here, the district court's ruling resolved the uncertainty of whether the contract gives Exxon the right to elect either of the liquidated damages remedies in the event West Texas repudiates the contract. We find there was no abuse of discretion.

■ We now address the principal issue of this appeal: What remedies does the parties' contract give to Exxon, as seller, if West Texas repudiates that contract? The parties agree that the contract is unambiguous. They disagree, however, on the interpretation of that contract. West Texas asserts that section 18.2(b) grants to it the unilateral right to terminate the contract and to limit its liability to the liquidated damages measurement detailed in that same section. West Texas believes that the language, "if BUYER specifically repudiates this Agreement" in section 18.2(b), clearly shows the intent of the parties to create a single liquidated damages payment in the event of repudiation. Exxon disagrees and argues that the intent of the parties was for Exxon to have the right to elect either "minor" or "major" breach damages if West Texas repudiates the contract.

■ Summary judgment is proper where the language of an agreement is plain and unambiguous. *Sturman v. First National Bank,* 729 P.2d 667 (Wyo.1986).

The Texas courts have enunciated the following rules of contract construction:

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. * * * The intention of the parties is discovered primarily by reference to the words used in the contract. Further, to determine the parties' actual intent, courts should ex-

---

**4.** Wyo.Stat. § 1–37–114 (1988) provides broad discretion to the district court:

The Uniform Declaratory Judgments Act is remedial. Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to legal relations, and is to be liberally construed and administered.

*See Holly Sugar Corporation v. Fritzler,* 42 Wyo. 446, 296 P. 206 (1931).

**5.** Wyo.Stat. § 1–37–108 (1988) provides, "The court may refuse to render a declaratory judgment where the judgment would not terminate the uncertainty or controversy giving rise to the proceeding." *See Wyoming Humane Society v. Port,* 404 P.2d 834 (Wyo.1965).

amine and consider the *entire writing* in an effort to harmonize and give effect to *all* the provisions of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.

*Preston Ridge Financial Services Corporation v. Tyler,* 796 S.W.2d 772, 775 (Tex. App.1990) (emphasis in original and citations omitted).

West Texas' primary argument that the court should confine its interpretation of the contract to section 18.2(b) runs counter to the following rule:

> [N]o single provision taken alone, much less a single cause in a sentence, has controlling effect. [The court] must consider and give effect to all the provisions of the contract so that none will be rendered meaningless.

*Preston Ridge Financial Services Corporation,* 796 S.W.2d at 778 (court rejected interpretation which would render introductory language of the contract meaningless).

It is clear from the contract that West Texas, in order to gain a guaranteed supply of coal at a fixed cost, wanted a long term agreement with Exxon. The contract states in its introduction that Exxon, "in reliance upon [West Texas'] firm, long-term commitment" to purchase coal for its power plants, agrees to make the "substantial investment of money, manpower and other resources needed to operate" its Wyoming mines. The contract provides in detail each party's rights and obligations under the contract—the contract includes twenty-eight separate articles and six exhibits. Neither party has the right, however, to repudiate the contract when the market price for coal rises or falls from that fixed in the contract. In fact, the parties specifically excluded price changes as grounds for obtaining relief under the provision of "Economic Hardship." Similarly, the parties did not include changes in the market price as part of their "Force Majeure" provisions, which permit either party to temporarily suspend its obligations under the contract. Nor do the parties list a change in the market price as one of the contingencies giving rise to either party's "Right to Terminate Agreement." There is simply no provision in the contract for renegotiating the price.[6]

The district court's analysis, reconciling section 18.1 (West Texas' remedies) with section 18.2 (Exxon's remedies), illuminates the parties' intent to create a long term relationship:

> In [section 18.1, West Texas] gave up its right to cancel under [the Texas] U.C.C. § 2–711. Even in the event of a major breach by Exxon the contract continues; [West Texas] has the right to liquidated damages or to cover but it must continue to accept the coal Exxon may supply for up to ten years. * * *
>
> * * * It is inconceivable that the parties could intend, in a paragraph (§ 18.2) specifying seller's rights and remedies, to enlarge the buyer's remedies far beyond those expressed or implied in another paragraph (§ 18.1) which specifically details the buyer's remedies.

A review of the entire contract convinces us that the parties intended to create a long term contractual relationship which would not be contingent upon the rise and fall of the market.[7]

> The normal risk of a fixed-price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller * * *; if it falls, * * * the seller gains at the expense of the buyer. The whole purpose of a fixed-price contract is to allocate risk in this way.
>
> *Northern Indiana Public Service Company v. Carbon County Coal Company,* 799 F.2d 265, 275 (7th Cir.1986). The court concluded that "to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract." *Id.*

---

**6.** West Texas could have protected itself from the risk that the market price for coal would fall below the price set in the contract if it had inserted a "reopener" provision into the contract. A market price reopener provision allows either party to renegotiate the contract price of the coal when it and the market price begin to head in opposite directions. The parties' second agreement for Oklaunion Unit No. 2 does include a reopener provision.

**7.** The Seventh Circuit Court of Appeals discussed the risks inherent to these types of long term agreements:

With the above in mind, we now focus on the section in dispute. The first thing to note about section 18.2 is that it enumerates Exxon's remedies. West Texas' remedies are found in the previous section (section 18.1). The language in this section is broad enough that West Texas' repudiation (failure to buy coal) could result in either a "minor" or a "major" breach of the contract.[8] According to the language, "If SELLER elects to cancel," appearing in section 18.2(b), the contract gives the right to Exxon, and not to West Texas, to elect whether or not to treat that repudiation as a "major" breach and cancel the contract. If, however, Exxon elects not to cancel the contract, West Texas' repudiation would remain a "minor" breach. This interpretation is consistent with the provision limiting Exxon to those remedies enumerated in the contract:

(c) The remedies [minor and major breaches] of this Section 18.2 shall be SELLER's sole remedies for any breach of this Agreement by BUYER which involves failure to accept quantities specified hereunder.[9]

Our holding is narrow: The contract is unambiguous, and the intent of the parties, as evinced from the entire writing, is for Exxon to have the right to pursue either remedy if West Texas repudiates the contract.

█ There is also some dispute about whether the contract requires West Texas to make annual payments if it repudiates the contract. The contract states:

Notwithstanding any other provision in this Agreement, to assure SELLER a minimum level of return on its adjusted investment, * * * the minimum charge to be paid by BUYER under this Agreement, including any payments pursuant to Section 18.2 [Exxon's remedies], shall in no calendar year, including years in which either party is in force majeure or breach, total less than the sum of SELLER's total costs incurred and/or accrued in its performance under this Agreement * * *.

This provision requires West Texas to make annual payments under the contract regardless of whether there is a breach by either party. It is too early, however, to address the issue of damages which may or may not arise under this provision. Similarly, West Texas' argument that the "minor" breach damages formula cannot be applied to future contract years is better left for another day.

West Texas asserts that Exxon's interpretation of the contract is not enforceable because it violates the Texas Uniform Commercial Code on "commercially reasonable time" and Texas public policy against splitting a cause of action. These two issues require further factual development, and, therefore, it would have been premature for the district court to have included them in its ruling on summary judgment.[10]

The district court also ruled that, if section 18.2(a) damages provisions should be declared to be unenforceable, U.C.C. § 2–708 would govern the measure of damages. We have already discussed why issues related to enforcement should not be decided at this time. The district court's ruling on this issue is reversed.

█ Exxon claims the district court erred when it ruled that, in interpreting the contract, it would not consider the extrinsic evidence submitted by Exxon. The district

---

**8.** Repudiation could be either a "minor" breach because "BUYER fails to accept some or all of the coal" or a "major" breach because "BUYER's default amounts to twenty per cent (20%) or more."

**9.** Tex.Bus. & Com.Code Ann. § 2.719 (Vernon 1968) permits the parties to "substitute" their own contractual remedies for those provided in the Code.

**10.** For instance, what is a "commercially reasonable time" depends upon the surrounding circumstances of the repudiation. What is a "commercially reasonable time" is a factor used in measuring the aggrieved party's damages. *See Cosden Oil & Chemical Company v. Karl O. Helm Aktiengesellschaft,* 736 F.2d 1064 (5th Cir. 1984). We have already stated that we will not address issues related to damages. Similarly, whether Exxon will seek annual damages if West Texas repudiates the contract and whether that would violate Texas public policy may also depend upon the particular facts.

court based its ruling on its determination that the contract was unambiguous and that extrinsic evidence was, therefore, unnecessary. Exxon has not demonstrated that this ruling constitutes an abuse of the district court's discretion to admit evidence. *L.U. Sheep Company v. Board of County Commissioners of County of Hot Springs,* 790 P.2d 663 (Wyo.1990).

We turn now to the issue raised in Exxon's cross-appeal: ·

Whether the trial court erred by dismissing Counts II and III of plaintiff's complaint as nonjusticiable even though the parties had joined issue on those claims and even though the purportedly "mooting" events were the eleventh-hour concessions of the defendant, made for the apparent purpose of preserving the defendant's freedom to relitigate the same issues against the plaintiff in another forum.

Exxon also sought a declaration that (1) West Texas' telephone calls did not comply with the contract's provisions for timely, sufficient written notice of force majeure and that (2) West Texas has no express, implied, or other contractual right to carry over a credit. The district court ruled that "there is presently no justiciable controversy between the parties" and granted West Texas' motion to dismiss.

Before the district court may grant declaratory relief, a justiciable controversy must exist. *See* Wyo.Stat. §§ 1–37–102 to –103 (1988). In *Police Protective Association of Casper v. City of Casper,* 575 P.2d 1146, 1149–50 (Wyo.1978), we stated:

[A] declaratory-judgment action will not lie unless there is an enforceable contract right—that is—the contract must be a valid agreement before a justiciable issue concerning its provisions may be framed for declaratory-judgment purposes..

The facts reveal an ongoing justiciable controversy between the parties over their interpretation of the force majeure and carry over credit issues. In a 1988 letter agreement, the parties settled their previous dispute on the issues of force majeure and carry over credit. This agreement did not resolve any future disputes which may arise on these issues. According to a 1990 affidavit by Exxon's sales manager, West Texas continues to ignore the contractual requirement compelling it to send written notices and instead notifies Exxon of claimed force majeure events via telephone calls.

Here, we have a binding contract which gives Exxon certain enforceable rights. Interpretation of the contract will terminate the controversy of whether telephone calls comply with the requirement for written notices. *See* § 1–37–103 (permits the court to resolve "questions" of contract construction and to declare the parties' rights). Interpretation of the contract will also promote the purpose of declaratory relief "to settle and to afford relief from uncertainty and insecurity with respect to legal relations, and [it] is to be liberally construed and administered." Wyo.Stat. § 1–37–114 (1988). The parties' contract states that written notice is required when "either party is prevented, or is delayed, wholly or in part, from carrying out any of its obligations under this Agreement due to force majeure or its effects, and *if such party gives the other party hereto written notice hereof.*" (Emphasis added.) The contract also requires that, "[e]xcept as otherwise provided herein, all notices required or permitted to be given hereunder shall be in writing." The contract states that, when the written notice is due, "BUYER shall immediately inform SELLER of the anticipated quantity of coal it will not be able to accept and the length of time during which BUYER reasonably anticipates it will be able to take only reduced quantities." There is no language in the contract giving a right to West Texas to carry over a credit. Thus, we hold that telephone calls do not comply with the above contract provisions requiring prompt written notice for claimed force majeure events and that West Texas does not have a right to carry over a credit.

Affirmed in part and reversed in part.