2002 WY 184

**Betty Jean WILLIAMS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 01–123.**

Supreme Court of Wyoming.

Dec. 31, 2002.

Kenneth M. Koski, State Public Defender; Donna Domonkos, Appellate Counsel; Diane Courselle, Director, Defender Aid Program; and Holly Magi Barringham, Student Intern., Representing Appellant. Argument by Ms. Barringham.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Robin Sessions Cooley, Senior Assistant Attorney General, Representing Appellee. Argument by Ms. Cooley.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] After trial, a jury convicted appellant, Betty Jean Williams (appellant), of five counts of forgery. We affirm.

## ISSUES

[¶ 2] Appellant sets forth three issues on appeal as follows:

I. Did the trial court abuse its discretion in allowing the State's expert, Richard Crivello, to testify regarding his opinions based on handwriting analysis when the trial court failed to make the requisite findings of reliability as required by *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] and *Kumho Tire* [*v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)] and adopted by the Wyoming Supreme Court?

II. Was the evidence presented to the jury sufficient to sustain a conviction for forgery?

III. Did the trial court err in failing to accept defendant's guilty plea when there was a clear factual basis for doing so?

Appellee State of Wyoming essentially agrees with those issues presented by appellant.

* Chief Justice at time of oral argument.

## FACTS

[¶ 3] During a ride in a taxi, the driver—who became the victim in this case—indicated that he needed to have some work performed at his home, including some painting. Appellant indicated that she would be interested in working for the victim. She testified she was to be paid hourly for her painting services up to approximately $400.00 and about $200.00 for supplies. The victim testified that appellant began work for him, however, they had not reached an agreement. In any event, appellant began providing painting services to the victim a day or so later.

[¶ 4] Toward the end of March of 2000, the victim went to New Mexico for a week. Upon return from this trip, victim reconciled his bank statement and noticed he had not written one of the checks drawn on his account. Later, he realized that four additional checks had also been forged. Ultimately, appellant was charged and convicted of forging the five subject checks written on the victim's account.

## STANDARD OF REVIEW

[¶ 5] The standard of review when faced with matters pertaining to the admission of testimony of expert witnesses was established in the case of *Bunting v. Jamieson,* 984 P.2d 467 (Wyo.1999) wherein this court adopted the reasoning used by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The standard has been further clarified as follows:

The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. Our opinion in *Joiner* [*General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)] makes clear that a court of appeals is to apply an abuse-of-discre-

tion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." 522 U.S. at 138–39, 118 S.Ct. 512, 139 L.Ed.2d 508. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.... Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). "In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did." *Campbell v. Studer,* 970 P.2d 389, 392 (Wyo.1998).

" '[D]ecisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal.' " It is also well established that a district court judgment may be affirmed on any proper legal grounds supported by the record. However, where the law imposes a duty on the district court to make findings on the record, we will not speculate as to the reasons for the decision. *Bunting,* 984 P.2d at 470 (quoting *English v. State,* 982 P.2d 139, 143 (Wyo.1999)).

A qualified expert witness may testify about scientific, technical, or specialized knowledge if such testimony will help the jury understand the case. W.R.E. 702. This court has adopted the federal *Daubert* model imposing gatekeeping responsibilities on trial courts deciding whether scientific or technical expert testimony is admissible. See *Bunting v. Jamieson,* 984 P.2d 467, 471 (Wyo.1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993)). In doing so, however, we did not "abandon our own precedent regarding the admissibility of expert testimony." *Bunting,* at 471. Under the *Daubert* model, the trial court must first deter-

mine whether the expert's methodology is reliable; then the court must determine whether the proposed testimony "fits" the facts of the particular case. *Id.* A district court's decision to admit or reject expert testimony is a decision solely within that court's discretion. *Seivewright v. State,* 7 P.3d 24, 29 (Wyo.2000); *Springfield v. State,* 860 P.2d 435, 438 (Wyo.1993); *Betzle v. State,* 847 P.2d 1010, 1022 (Wyo.1993). *Chapman v. State,* 2001 WY 25, ¶ 8, 18 P.3d 1164, ¶ 8 (Wyo.2001).

[¶ 6] The standard of review for sufficiency of the evidence issues is also well established. We assess whether all the evidence presented is adequate to form the basis for an inference of guilt beyond a reasonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State. We do not consider the evidence presented by the unsuccessful party which conflicts with the successful party's evidence, and afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. Even though it is possible to draw other inferences from the evidence presented, the jury has the responsibility to resolve conflicts in the evidence. We will not substitute our judgment for that of the jury when we are applying this rule; our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did. *Black v. State,* 2002 WY 72, ¶ 4, 46 P.3d 298, ¶ 4 (Wyo.2002) (citing *Vanvorst v. State,* 1 P.3d 1223, 1228 (Wyo.2000); *Harris v. State,* 933 P.2d 1114, 1123 (Wyo.1997); and *Blake v. State,* 933 P.2d 474, 480 (Wyo.1997)).

### DISCUSSION

#### Admissibility of Expert Testimony

[¶ 7] Appellant complains that the district court abused its discretion in allowing the handwriting expert proffered by the State to testify regarding those opinions he formed based on his handwriting analysis. According to appellant, the district court failed to follow the clearly established guidelines for exercising its gatekeeping role as detailed in

the cases of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) and thus allowed expert testimony to be presented to the jury that was not demonstrably reliable. Specifically, appellant argues that while she agrees that handwriting analysis and expertise in that area are "not scientific," this did not excuse the court from its gatekeeping responsibilities. Thus, appellant argues that the district court erred because it failed to substantively address any of the required factors concerning the reliability of the testimony of the handwriting expert. In response, the State claims that the district court did not abuse its discretion in allowing the handwriting expert to testify, as it appropriately allowed the parties to voir dire the expert and made a sufficiently detailed ruling on the record as to the reliability of such anticipated testimony.

[¶ 8] This court first adopted the reasoning used by the United States Supreme Court in *Daubert,* and later clarified in the case of *Kumho Tire Company,* in its opinion in *Bunting v. Jamieson,* 984 P.2d 467. Under the *Daubert* model, the trial court must first determine whether the expert's methodology is reliable; then the court must determine whether the proposed testimony "fits" the facts of the particular case. *See also Chapman,* 2001 WY 25, ¶ 8, 18 P.3d 1164. As pointed out by appellant, *Bunting,* at 472, reiterated four non-exclusive factors utilized in *Daubert* for guiding a trial court in its inquiry into the reliability of proffered expert testimony:

1) Whether the theory or technique in question can be and has been tested;

2) Whether it has been subjected to peer review and publication;

3) The known or potential rate of error for the utilized theory or technique along with the existence and maintenance of standards controlling the applicable process; and

4) The degree of acceptance within the relevant scientific community.

*Id.* at 472. *Bunting* also discussed additional factors that may be utilized by a trial court in fulfilling its gatekeeping function including:

1) The experience and specialized expertise of the proffered expert;

2) Whether or not that expert is testifying about matters occurring "naturally and directly" out of research conducted independent of litigation; and

3) Any "non-judicial" utilization of the expert methodology in question.

*Id.*

[¶ 9] In this case, upon appellant filing an objection to the proposed testimony of the handwriting expert on the day prior to trial, the district court initially believed that a *Daubert*-style hearing was unnecessary, relying on the case of *United States v. Starzecpyzel,* 880 F.Supp. 1027 (S.D.N.Y.1995) holding that forensic document examination was not subject to *Daubert*-type review regarding admissibility of expert testimony. Upon further argument of counsel, however, the district court deferred its ruling on the objection. Ultimately, the district court allowed a *Daubert*-style hearing, and counsel for both parties were given the opportunity to voir dire the proposed handwriting expert, Mr. Crivello, outside the presence of the jury.

[¶ 10] During voir dire, the State provided a thorough offer of proof regarding Mr. Crivello's qualifications as a forensic documents examiner, including his 16½ years of employment with the Wyoming State Crime Laboratory as a forensic document examiner; that he had acquired a two-year police science degree; that he had taken part in a 3½ year training progression at the Colorado Bureau of Investigation; and that he had attended numerous government training courses on document examination offered by the United States Secret Service, United States Federal Bureau of Investigation, and the United States Postal Inspector's Service. Mr. Crivello also testified that he had attended numerous other meetings or seminars relating to document examination and that he worked an average of 30 to 50 document examination cases per year. Additionally, Mr. Crivello indicated that he had been qualified as an expert in both state and federal court, the United States Military Court, and

before several state boards. Furthermore, Mr. Crivello stated that he had never failed proficiency testing of his work in the area over the past 16½ years and spoke about the substantial history of the field of document examination and his familiarity with numerous recognized books in this field. He also addressed various technical changes in the field, peer review publications, and articles which support that trained experts can discern pertinent information from their analysis of documents which lay persons cannot.

[¶ 11] In countering this testimony, appellant's counsel noted that Mr. Crivello was not a certified forensic examiner and argued that handwriting analysis was not significantly quantifiable or measurable, casting doubt on its reliability. Ultimately, the district court found as follows:

Counsel, as briefly discussed before beginning voir dire, the Court is aware that there are two approaches to handle, quote, expert testimony of forensic document examiners. The Court believes and will hold, unless otherwise ordered by the Wyoming Supreme Court, that in Wyoming forensic document examination expertise is outside the scope of *Daubert.*

However, obviously, I wanted to give counsel an opportunity to protect their record by offering facts that might satisfy the *Daubert* test. The testimony evidences to me the reason why Wyoming ought to adopt the rationale adopted by *U.S. v. Starzecpyzel,* 880 F.Supp. 1027 (S.D.N.Y. 1995).

For purposes of this hearing, the Court finds that Mr. Crivello has demonstrated the actual knowledge obtained by education and experience that is appropriate in the area of forensic document examination and, of course, what we discussed before his testimony; and that is that in forgery cases, in particular, forensic document examination testimony is relevant and generally helpful to juries when deciding factual issues.

. . .

And as far as I know, and the state of Wyoming law, it's within the Court's discretion to, you know, allow this sort of thing. And based on what I've heard, I see no reason not to allow Mr. Crivello to testify as a forensic document examination specialist.

[¶ 12] Later, at the insistence of the State, the district court made additional findings concerning the issue of reliability.

THE COURT: I just wanted to stay away from equating what Mr. Crivello does with our normal definition of "scientific." And I suppose if we call it other specialized knowledge, as they use in *Kumho Tire,* it would be appropriate. So what type of findings are you suggesting in support of that path?

[PROSECUTOR]: I think the evidence is that, number one—and this was the one that the court found in *Kumho*—that the witness is credible and qualifies as an—has sufficient qualifications to qualify as an expert in that field.

I think the other thing is that Mr. Crivello's testimony also establishes that this is an area where it can be tested. It is capable of being tested by the proficiency test that they take. I think it's also another measure of reliability.

. . .

[PROSECUTOR]: I think that is a sign of its testability, the fact that there's a company out there that sends one handwriting stuff every year and then every year also sends out other forms of document examination to be performed and that document examiners such as he do those tests, submit their answers. Those answers are then graded, and it's determined how they did and published how they did. And Mr. Crivello in his 16 years of doing this hasn't failed a proficiency test.

THE COURT: That certainly supports the Court's finding that I believe I already made, that he qualifies as an expert witness regarding forensic document examination. That is certainly in support of that.

[PROSECUTOR]: And even the ability to test in that way, the proficiency testing is something I know came up in the DNA things. And their proficiency testing ran into obstacles that aren't present here.

We think it shows that it is reliable. They come up with the right answer. We think that the peer-reviewed articles that we produced to the Court from the Journal of Forensic Sciences also demonstrates that they come up with the right answer, that it's reliable. The peer-reviewed literature supports it. And, in fact, that it is a longstanding discipline, that it's generally accepted. . . .

THE COURT: Well, the Court agrees that the area of handwriting analysis has been utilized for decades in Wyoming and has been relied upon by trial courts.

. . .

THE COURT: Again, the Court sees no reason to exclude the testimony of Mr. Crivello under traditional expert witness standards nor under the *Daubert*-type analysis.[1]

[¶ 13] Upon review of the record before us, it becomes apparent that the district court found, based on sufficient evidence presented, that forensic document techniques have been and are tested and that forensic document examination has been the subject of considerable peer review and publication. In addition, the district court found upon adequate proof being laid that there existed appropriate testing procedures to assure and maintain the standards of the profession and that such profession had been accepted within the relevant scientific community for many years. Accordingly, we hold that the district court properly considered each of the four enumerated factors first set forth in *Daubert* and thereafter explicitly adopted by this court in *Bunting*. Likewise, the court appropriately found that the proffered handwriting expert was sufficiently qualified through adequate experience and specialized expertise in the area as expressed in *Bunting*.[2]

1. It should also be noted that when asked if appellant had any other proposed findings to suggest, appellant's counsel declined this offered opportunity.

2. Although not challenged by appellant on appeal, we further find that the district court properly determined that the proffered testimony "fit" the disputed issues of fact in this case as required under *Daubert*. *See Bunting v. Jamieson*, 984 P.2d 467, 472 (Wyo.1999).

[¶ 14] Appellant argues that the opinion testimony of the handwriting expert was "particularly problematic" as it was the "least reliable aspect of" the expert's testimony because it was based upon speculation and conjecture and was merely subjective in nature. As noted earlier, in attempting to point out this position, appellant identified that Mr. Crivello was not a certified forensic document examiner and argued that handwriting analysis is not significantly quantifiable or measurable because differing results can be obtained by separate analysis depending on the specific examiner utilized.[3]

[¶ 15] In *Bunting*, 984 P.2d at 472, this court recognized an awareness of criticism that the application of the *Daubert* approach to exclude evidence resulted in a possible misappropriation of the jury's responsibilities. This court further recognized that it is imperative that the jury retain its fact-finding function. Accordingly, this court noted that in order to alleviate this potential conflict, *Daubert* admonished that methodology should be distinguished from the conclusion of the expert. *Id.*

> Thus, a trial judge need not and should not determine the scientific validity of the conclusions offered by an expert witness. Rather, to decide admissibility, the trial judge should only consider the soundness of the general scientific principles or reasoning on which the expert relies and the propriety of the methodology applying those principles to the specific facts of the case. Charles Alan Wright & Victor James Gold, supra, at § 6233; *see also Springfield*, *supra*, quoting *Jakobetz*, 955 F.2d at 797 ("In other words, the court need not make the initial determination that the expert testimony or the evidence proffered is true before submitting the information to the jury.").

3. Nevertheless, the record reflects that although Mr. Crivello noted that the accuracy of document analyses might differ based on the experience of the examiner, sufficient qualification through standardized testing to assure analysis accuracy alleviated such possible discrepancy and made the field much more objective in nature.

The ultimate question for the trial judge is whether both sides will have a fair opportunity to test the validity of scientific results; if not, those results should not be admissible.

... [E]xpert testimony should be admitted so long as it can be adequately tested by an adversary.

Daniel J. Capra, *The Daubert Puzzle,* 32 Georgia Law Rev. No. 3, 699, 705 (Spring 1998).

*Bunting,* at 472–73. Our opinion in *Bunting,* at 475–76, further clarifies that the important determination that must be squarely addressed by the trial court is whether or not the analysis of the expert in question is "grounded on something other than 'subjective belief or unsupported speculation' " and if such opinion "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." The application of the *Daubert* approach requires the trial court to consider all factors relevant to the reliability of a proposed expert's testimony, with a focus on the methodology of the expert, not his or her conclusions. *In accord see General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 516, 139 L.Ed.2d 508 (1997), *Black v. Food Lion, Inc.,* 171 F.3d 308, 311 (5th Cir. 1999), and *Kumho Tire Company,* 526 U.S. at 152, 119 S.Ct. at 1176, 143 L.Ed.2d at 252–53.

[¶ 16] We also agree with those comments made in 15 Am.Jur. Proof of Facts 3d, *Handwriting Identification,* § 27 (1992) which states:

Each time a forensic handwriting expert testifies in court, he or she must be qualified as an expert witness. Since there is no college or university where one can earn a degree in document examination, the expert must demonstrate to the satisfaction of the court that he or she has acquired special knowledge and skills in the field. The ability to detect forgeries and identify handwriting is gained primarily through self-study and experience.

As one authority has noted,

[h]andwriting experts establish their opinions on the internal evidence of the matter in dispute. Such opinions are based upon their knowledge and experience and keen perception gained through many years of careful study. . . . [Baker, *Law of Disputed and Forged Documents* 166 (1955).]

... Contrary to popular belief, determining the genuineness of a signature or handwriting is not a simple matter. Years of study, training, and experience are required to become truly proficient in the field of forensic document analysis.

[¶ 17] This same treatise goes on to identify that there exists a number of professional organizations to which a handwriting expert may belong that afford education, research, and professionalism. Participation in these organizations, however, while very helpful, may not be indicative of a handwriting expert's true expertise. Therefore, a court must assure that the proffered handwriting expert witness is genuinely qualified and has the absolute ability to render his or her adopted opinions through testimony in front of a jury. *Id.*

[¶ 18] As we have said in the context of the trial court's discretionary duties in determining the best interests of a child, an abuse of discretion is present " 'when a material factor deserving significant weight is ignored.' " *Reavis v. Reavis,* 955 P.2d 428, 431 (Wyo.1998); *Triggs v. Triggs,* 920 P.2d 653, 657 (Wyo.1996) (quoting *Vanasse v. Ramsay,* 847 P.2d 993, 996 (Wyo.1993)).

To determine whether a district court has abused its discretion, we must rely on the district court's articulation of the factors which were considered and how those factors support its conclusions.

To play fair, a trial judge relying on discretionary power should place on record the circumstances and factors that were crucial to his determination. He should spell out his reasons as well as he can so that counsel and the reviewing court will know and be in a position to evaluate the soundness of his decision.

*Reavis,* 955 P.2d at 431–432 (quoting Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635, 665–66 (1971)). Recently,

in *English,* 982 P.2d at 144, we recognized that the abuse of discretion standard, when applied to the admission of testimony under the catch-all exception to the hearsay rule, requires the district court to set forth its reasoning in more detail than may be required under other circumstances. See also, *Betzle v. State,* 847 P.2d 1010, 1021 (Wyo.1993). The catch-all exception imposes stringent restrictions on its use, as compared to Rule 702, which is intended to promote admissibility of trustworthy evidence. However, we believe that the trial court's decision to dispose of a case by precluding expert testimony requires the same level of judicial explanation supporting its discretionary decision as the admission of testimony under the catch-all exception. A single conclusory statement applying one nondispositive *Daubert* factor is insufficient.

*Bunting,* at 475. Moreover, as recognized above, decisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal. *Id.* at 470 (quoting *English v. State,* 982 P.2d at 143).

[¶ 19] In this instance, the record reflects that the district court sufficiently set forth those factors on which it relied in making its ultimate decision to allow the proffered handwriting expert to testify before the jury and that such determination was legitimately based. Again, Mr. Crivello testified that forensic document techniques have been and are tested and that forensic document examination has been the subject of considerable peer review and publication. In addition, appropriate testing procedures exist to assure and maintain the standards of the profession with this profession having been accepted in the relevant scientific community for many years. Further, as noted above, adequate foundation was laid as to Mr. Crivello's competency in his expressed area of expertise.

[¶ 20] We also recognize that appellant, through her counsel, was afforded and thoroughly exercised the opportunity to cross-examine this expert to adequately test his expressed opinions and point out to the jury those reasons she believed that the testimony was not credible and should not have been relied upon by the jury. As again previously expressed by this court in *Bunting,* at 471–72:

It is important to note, however, that *Daubert* recognized "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469. As one court has stated:

Clearly, the Court envisioned cases in which expert testimony meets the *Daubert* standard yet is "shaky," and cases in which admissible expert testimony provides only a "scintilla" of support for a claim or defense. Put differently, an expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue—but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production.

*Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 152 (3rd Cir.1999). Thus, while the burden is on the party offering the testimony to show that the testimony is admissible, *Graham v. Playtex Products,* 993 F.Supp. 127, 129 (N.D.N.Y.1998), a ruling on a motion in limine does not impose the same burden on the party offering the evidence as would be applied on a motion for summary judgment. Rather, the focus is on the admissibility of the testimony, not its ultimate sufficiency in establishing the case.

[¶ 21] Finally, we take this opportunity to clarify that this court does not adopt that rule of law expressed in the opinion of *United States v. Starzecpyzel,* 880 F.Supp. 1027 (S.D.N.Y.1995) holding that forensic document examination cannot be regarded as scientific knowledge within the meaning of the rule regarding admissibility of expert testimony and that as such, a *Daubert*-style review did not prove necessary in such an instance. To the contrary, this court has

clearly expressed in *Bunting,* at 471 (citing *Kumho Tire Company,* 526 U.S. at 149, 119 S.Ct. at 1175, 143 L.Ed.2d at 251):

We conclude that *Daubert's* general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. See Fed. Rule Evid. 702.

[¶ 22] This court has also previously recognized in *Bunting,* at 470–71, that the admissibility of expert testimony is derived directly from W.R.E. 702, which states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We also clarified in *Bunting,* at 471, the primary responsibility of the trial court when faced with issues surrounding the admissibility of expert testimony under W.R.E.702.

Our traditional analysis is found in *Springfield v. State,* 860 P.2d 435, 443 (Wyo.1993), where we stated:

[I]n ruling upon the offer of such evidence in Wyoming, our trial courts need only be concerned with the requisite foundation. Because it does appear the possibility of an erroneous result is more likely to arise from the testing techniques than from the procedure, it is important for the trial court to be satisfied about the manner in which the testing was performed, and the qualifications of the individual who accomplished the scientific technique.

(Quoting *Rivera v. State,* 840 P.2d 933, 942 (Wyo.1992)).

[¶ 23] The language used within W.R.E. 702 could not be any clearer that it applies not only to proffered experts that desire to express an opinion on some scientific bases but also to those opinions with a foundation based upon technical or any other specialized knowledge. In addition, the reasoning used within the opinion in *United States v. Starzecpyzel,* 880 F.Supp. 1027, frankly does not

persuade us that we should abandon our previously expressed holding that a trial court is mandated to exercise its gatekeeping function in each of these specifically expressed circumstances.

[¶ 24] As clearly set forth within the United States Supreme Court's opinion in *Kumho Tire Company,* 526 U.S. at 147–49, 119 S.Ct. at 1174–75, 143 L.Ed.2d at 249–51, with which we whole heartedly concur:

In *Daubert,* this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U.S., at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. The initial question before us is whether this basic gatekeeping obligation applies only to "scientific" testimony or to all expert testimony. We, like the parties, believe that it applies to all expert testimony. See Brief for Petitioners 19; Brief for Respondents 17.

For one thing, Rule 702 itself says:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

This language makes no relevant distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. It makes clear that any such knowledge might become the subject of expert testimony. In *Daubert,* the Court specified that it is the Rule's word "knowledge," not the words (like "scientific") that modify that word, that "establishes a standard of evidentiary reliability." 509 U.S., at 589–590, 113 S.Ct. 2786, 125 L.Ed.2d 469. Hence, as a matter of language, the Rule applies its reliability standard to all "scientific," "technical," or "other specialized" matters within its scope. We concede that the Court in *Daubert* referred only to "scientific" knowledge. But as the Court there said, it referred to "scientific" testimony "because that [wa]s the nature of the

expertise" at issue. *Id.*, at 590, n. 8, 113 S.Ct. 2786, 125 L.Ed.2d 469.

Neither is the evidentiary rationale that underlay the Court's basic *Daubert* "gatekeeping" determination limited to "scientific" knowledge. *Daubert* pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*, at 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (pointing out that experts may testify to opinions, including those that are not based on firsthand knowledge or observation). The Rules grant that latitude to all experts, not just to "scientific" ones.

Finally it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. There is no clear line that divides the one from the others. Disciplines such as engineering rest upon scientific knowledge. Pure scientific theory itself may depend for its development upon observation and properly engineered machinery. And conceptual efforts to distinguish the two are unlikely to produce clear legal lines capable of application in particular cases. Cf. Brief for National Academy of Engineering as *Amicus Curiae* 9 (scientist seeks to understand nature while the engineer seeks nature's modification); Brief for Rubber Manufacturers Association as *Amicus Curiae* 14–16 (engineering, as an " 'applied science,' " relies on "scientific reasoning and methodology"); Brief for John Allen et al. as *Amici Curiae* 6 (engineering relies upon "scientific knowledge and methods").

Neither is there a convincing need to make such distinctions. Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." Hand, Historical and Practical Considerations regarding Expert Testimony, 15 Harv. L.Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." *Ibid.* The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S., at 590, 113 S.Ct. 2786, 125 L.Ed.2d 469. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.*, at 592, 113 S.Ct. 2786, 125 L.Ed.2d 469. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, see Part III, *infra*, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S., at 592, 113 S.Ct. 2786, 125 L.Ed.2d 469.[4]

### *Sufficiency of the Evidence*

[¶ 25] Appellant in her second issue argues that insufficient evidence was presented at trial to prove that appellant had the specific intent to defraud the victim, a specific element required Wyo. Stat. Ann. § 6–3–602(a)(iii). In particular, appellant asserts

---

4. Indeed, upon our reading of the United States Supreme Court's opinion in *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), we conclude that such opinion implicitly, if not expressly, overrules that holding reached by the court in *United States v. Starzecpyzel,* 880 F.Supp. 1027 (S.D.N.Y.1995) insofar as that opinion holds that forensic document examination cannot be regarded as scientific knowledge within the meaning of the rule regarding admissibility of expert testimony and that, as such, a *Daubert*-style review was not necessary.

the only testimony that tended to prove the requisite intent of appellant was presented through handwriting expert Mr. Crivello, and his sole testimony was that he was unable to testify with any certainty that the victim did not write the subject checks or that appellant did write these checks. Appellant cites the case of *Hamburg v. State*, 820 P.2d 523 (Wyo.1991) in support of this position, contending that in the *Hamburg* opinion this court refused to equate a handwriting expert's statements that it was "probable" that the defendant prepared certain signatures on an election petition to the necessary "beyond a reasonable doubt" burden of proof required in a criminal case.[5]

[¶ 26] Upon our independent review, we hold that sufficient evidence was presented that each of the crimes alleged were committed by appellant. Considerable additional evidence other than simply the testimony of Mr. Crivello exists in this case whereby the jury could have found appellant guilty of the crimes alleged beyond a reasonable doubt.

[¶ 27] The victim testified that he had not given appellant the involved checks and had never intended to pay appellant over $950.00 to help him paint his house. In addition, Officer Chris Dahmke testified that when he interviewed appellant, she told him her agreement with the victim was that she would receive between $500.00 to $600.00 for such services, including costs for needed supplies. The victim, however, testified that he had already purchased supplies and there was no agreement ever reached as to the amount he would pay appellant for her painting services.

[¶ 28] The victim went on to testify he was out of town in New Mexico when appellant endorsed the checks over to the bank, and that she had a number of opportunities to take the checks when she was alone in his home or later because, when he left for New Mexico, he had left his home unlocked so a neighbor could get inside his home. Additionally, Officer Dahmke testified appellant had lied to him about being in Arkansas when they were initially trying to contact her

about the checks evidencing at least some intent on her part to deceive.

[¶ 29] Critically, additional detailed evidence was presented as to appellant's activities surrounding the involved checks. Bank employees testified to appellant's odd behavior when cashing and depositing the checks and to her banking transactions. On March 23, 2000, appellant deposited at the bank's lobby counter check number 5673, drawn on the victim's account and made payable to appellant, into her savings account. Appellant was required and did open a savings account in order to cash this check. The check was in the amount of $150.00 and was dated March 24, 2000. Appellant retained $100.00 in cash from that check.

[¶ 30] The next day at approximately 9:36 a.m., appellant, using the drive-through window at the bank, withdrew $10.00 from her savings account. On March 27, 2000, at approximately 8:57 a.m., appellant, again using the drive-through window, withdrew $20.00 from her savings account. Approximately one hour later, at 9:56 a.m., appellant again utilized the drive-through window to deposit check number 5687, drawn on the victim's account and made payable to appellant. The check was in the amount of $275.00. Appellant retained $225.00 in cash from that check. Finally, that same day at approximately 2:29 p.m., appellant deposited check number 5686, drawn on the victim's account and made payable to appellant, at the bank's lobby counter. The check was in the amount of $50.00 and was dated March 29, 2000. Appellant retained $30.00 in cash from that check.

[¶ 31] The following day, on March 28, 2000 at approximately 9:01 a.m., appellant, at the drive-through window, withdrew $60.00 from her savings account. That same date, again only a short time later, at 10:30 a.m., appellant withdrew $10.00 from her savings account in the lobby of the bank. Thereafter, at 12:53 p.m., appellant deposited check number 5695, drawn on the victim's account and made payable to appellant at the bank's lobby counter. The check was in the amount of $275.00. There was no date on this check. Appellant retained $75.00 in cash from that check.

5. Mr. Crivello was also the handwriting expert involved in the *Hamburg v. State* case.

[¶ 32] Still, on March 28, 2000, at approximately 1:18 p.m., appellant deposited check number 5694 using the drive through window. This check, in the amount of $200.00 and dated March 28, 2000, was likewise drawn on the victim's account and made payable to appellant. Appellant retained $200.00 in cash from that check. Also, during this same transaction, appellant withdrew $219.00 from her savings account, leaving $1.00 remaining in that account. Mr. Crivello testified that it was his opinion based upon his examination of the checks and the exemplars obtained from appellant that appellant had endorsed the back of each of the subject checks. Officer Dahmke also stated that appellant had admitted to him that she had endorsed these checks.

[¶ 33] In addition, appellant's argument regarding the applicability of our holding in *Hamburg v. State*, 820 P.2d 523, to this case lacks merit. In *Hamburg*, the defendant was convicted of forging several names on a political petition. With respect to certain signatures on the petition, the handwriting expert testified that the defendant either "very probably" or "probably" forged these signatures. As this was the sole testimony leading to conviction by the jury, this court held that the words "very probably" or "probably" could not equate to guilt beyond a reasonable doubt.

[¶ 34] In this case, Mr. Crivello testified that he had no opinion concerning whether appellant had written on the front of the subject checks because he could not identify that she had or had not written the statements that appeared on this side of the checks. He also testified it was his opinion that the handwriting that appeared on the front of the checks was not consistent with those exemplars obtained from the victim. Finally, when specifically questioned by appellant's counsel concerning the nine point ASTM standard E1658, Mr. Crivello testified that if he had to equate his findings to those terms or standards with respect to whether the victim had or had not made the handwriting that appeared on the face of the checks, he stated that it would be "similar to that of saying probable or very probable they were not prepared by [the victim]."

[¶ 35] Therefore, unlike the testimony in *Hamburg*, Mr. Crivello did not present any opinion on whether or not appellant had authored the front of the checks. Indeed, he expressed no opinion on this topic. Mr. Crivello's testimony that the victim "very probabl[y]" or "probabl[y]" did not author the front of the checks is much different than the testimony of the handwriting expert in *Hamburg* who opined that the defendant "probably" authored the signature on the petition. Additionally, as pointed out above, a substantial amount of additional evidence was presented at trial concerning appellant's actions with respect to the checks, while in *Hamburg* no other evidence aside from the handwriting expert's testimony was presented on that particular topic. Accordingly, we find the facts in this case to be distinguishable from those facts involved in *Hamburg*, and our opinion in *Hamburg* is not applicable to our conclusion in this case.

[¶ 36] Adequate evidence existed in this case for the jury to form the basis for an inference of guilt beyond a reasonable doubt when such evidence is viewed in the light most favorable to the State as required. We will not substitute our judgment for that of the jury; our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did. *Black v. State*, 2002 WY 72, ¶ 4, 46 P.3d 298.

### Denied Acceptance of Guilty Plea

[¶ 37] Finally, appellant argues that the district court erred in failing to accept appellant's guilty plea at the pretrial conference when a clear factual basis existed to support this plea despite appellant's protestations of innocence. Appellee asserts that a clear factual basis in support of a guilty plea was never presented to the district court and that, ultimately, appellant withdrew her initially contemplated desire to pled guilty. Therefore, appellee contends that it was impossible for the district court to have committed any error.

[¶ 38] Upon our review of the record, we conclude that appellant's voluntary withdrawal of her anticipated guilty plea ren-

ders this issue moot. The transcript of the pretrial conference indicates that initially the district court was apprised of the desire of appellant to plead guilty under specified plea agreement terms reached between the parties. Accordingly, the district court requested that the prosecutor explain, in detail, the terms of the plea agreement to the court and advised appellant to listen carefully so that she could confirm that this was the agreement reached. After recitation of the plea agreement terms by the prosecutor, appellant agreed that the plea agreement was as stated, and the district court proceeded to ensure that appellant's guilty plea was knowing and voluntary. Eventually, after explaining to appellant the constitutional rights that she would be waiving were she to enter a guilty plea, the district court asked that appellant provide a factual basis to support this plea.

[¶ 39] Appellant indicated that she had not forged the checks involved but that she had been given these checks by the victim. At this stage of the proceedings, the district court expressed its difficulty in accepting the guilty plea offered by appellant as there was no factual basis for it and since appellant denied any wrongdoing. Critically, however, the district court did not at any time ever advise appellant that it would not accept appellant's guilty plea.[6]

[¶ 40] Appellant's counsel abruptly then requested an opportunity to speak with appellant which was allowed. Immediately thereafter, appellant voluntarily withdrew her anticipated guilty plea. Hence, we hold that when appellant voluntarily withdrew her anticipated guilty plea, she removed any jus-

ticiable controversy concerning this issue. It has long been recognized that a justiciable controversy must exist before this court will address those issues asserted. *Southwestern Pub. Serv. Co. v. Thunder Basin Coal Co.*, 978 P.2d 1138, 1142 (Wyo.1999) (citing *Reiman Corp. v. City of Cheyenne*, 838 P.2d 1182, 1185–86 (Wyo.1992) and *West Texas Utilities Co. v. Exxon Coal USA, Inc.*, 807 P.2d 932, 938 (Wyo.1991)). *See also Wyoming Bd. of Outfitters & Professional Guides v. Clark*, 2002 WY 24, ¶ 9, 39 P.3d 1106, ¶ 9 (Wyo.2002), and *International Ass'n of Fire Fighters, Local 279 v. Civil Serv. Comm'n of Fire Dep't of City of Cheyenne*, 702 P.2d 1294, 1297 (Wyo.1985).

[¶ 41] Moreover, we recognize that any contrary result would allow appellant an unfair advantage. It is disingenuous and unjust to allow appellant to assert an anticipated guilty plea, voluntarily withdraw it from consideration and proceed to trial and, thereafter, when an unacceptable result and sentence is rendered in appellant's mind, assert that she was not allowed to plead guilty prior to trial.

## CONCLUSION

[¶ 42] For the foregoing reasons, the convictions of appellant for forgery are affirmed.

---

**6.** At this juncture, the district court was first advised by appellant's counsel that appellant desired to enter an *Alford* plea (*North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)) because although she admitted to no culpability with respect to the alleged forgeries asserted, her entry of a guilty plea would be beneficial to her. (Apparently, appellant felt that her

plea of guilty might result in a sentence where she would not have to spend any jail time and would thwart the State from its admitted contemplated attempt to amend the information against her to assert separate forgery counts against her for each of the checks involved rather than proceed on the single count of forgery then pending.)