2008 WY 124

**Trent Breon DEAN, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–08–0017.**

Supreme Court of Wyoming.

Oct. 10, 2008.

Representing Appellant: Diane M. Lozano, Wyoming State Public Defender; Tina N. Kerin, Appellate Counsel; and Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Jenny L. Craig, Assistant Attorney General. Argument by Ms. Craig.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Trent Breon Dean (Mr. Dean), was convicted of committing a third or subsequent battery against a household member, in violation of Wyo. Stat. Ann. § 6–2–501(b) and (f)(ii) (LexisNexis 2007).[1] This battery was committed upon his wife and it was a third or subsequent offense of such a

---

1. § 6–2–501. Simple assault; battery; penalties.

(a) A person is guilty of simple assault if, having the present ability to do so, he unlawfully attempts to cause bodily injury to another.

crime by Mr. Dean (although the prior offenses included victims other than his wife, Mrs. Dean was subjected to at least 5 documented prior domestic violence incidents). By Judgment and Sentence entered on November 9, 2007, and amended on December 4, 2007, Dean was sentenced to serve a term of imprisonment of 36 to 50 months.

[¶ 2] Dean contends that the district court erred in permitting an expert witness

**(b) A person is guilty of battery if he unlawfully touches another in a rude, insolent or angry manner or intentionally, knowingly or recklessly causes bodily injury to another.**

(c) Except as provided by subsection (e) of this section, simple assault is a misdemeanor punishable by a fine of not more than seven hundred fifty dollars ($750.00).

(d) Except as provided by subsection (f) of this section, battery is a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both. Notwithstanding any other provision of law, the term of probation imposed by a judge under this subsection may exceed the maximum term of imprisonment established for the offense under this subsection provided the term of probation, together with any extension thereof, shall in no case exceed one (1) year.

(e) A household member as defined by W.S. 35–21–102 who is convicted upon a plea of guilty or no contest or found guilty of simple assault against any other household member, after having been convicted upon a plea of guilty or no contest or found guilty of a violation of W.S. 6–2–501(a), (b), (e) or (f), 6–2–502, 6–2–503, 6–2–504 or other substantially similar law of this or any other state, tribe or territory against any other household member, is guilty of a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both.

**(f) A household member as defined by W.S. 35–21–102 who commits a second or subsequent battery against any other household member shall be punished as follows:**

(i) A person convicted upon a plea of guilty or no contest or found guilty of a second offense under this subsection against any other household member, after having been convicted upon a plea of guilty or no contest or found guilty of a violation of W.S. 6–2–501(a), (b), (e) or (f), 6–2–502, 6–2–503, 6–2–504 or other substantially similar law of this or any other state, tribe or territory against any other household member within the previous five (5) years is guilty of a misdemeanor punishable by imprisonment for not more than one (1) year, a fine of not more than one thousand dollars ($1,000.00), or both. Notwithstanding any other provision of law, the term of probation imposed by a court under this paragraph may

to vouch for the credibility and truthfulness (or lack thereof) of witnesses who have been victims of domestic violence (and, thus, also Mrs. Dean), as well as in permitting that same expert witness to provide improper character evidence concerning Mr. Dean. We will affirm.

## ISSUES

[¶ 3] Dean raises these issues:

exceed the maximum term of imprisonment established for this offense under this paragraph provided the term of probation, together with any extension thereof, shall in no case exceed two (2) years;

**(ii) A person convicted upon a plea of guilty or no contest or found guilty of a third or subsequent offense under this subsection against any other household member, after having been convicted upon a plea of guilty or no contest or found guilty of a violation of W.S. 6–2–501(a), (b), (e) or (f), 6–2–502, 6–2–503, 6–2–504 or other substantially similar law of this or any other state, tribe or territory against any other household member within the previous ten (10) years is guilty of a felony punishable by imprisonment for not more than five (5) years, a fine of not more than two thousand dollars ($2,000.00), or both.**

**§ 35–21–102. Definitions.**

(a) As used in this act:

(i) "Adult" means a person who is sixteen (16) years of age or older, or legally married;

(ii) "Court" means the circuit court or, if the county does not have a circuit court, the district court in the county where an alleged victim of domestic abuse resides or is found;

(iii) "Domestic abuse" means the occurrence of one (1) or more of the following acts by a household member but does not include acts of self defense:

(A) Physically abusing, threatening to physically abuse, attempting to cause or causing physical harm or acts which unreasonably restrain the personal liberty of any household member;

(B) Placing a household member in reasonable fear of imminent physical harm; or

(C) Causing a household member to engage involuntarily in sexual activity by force, threat of force or duress.

**(iv) "Household member" includes:**

**(A) Persons married to each other;**

(B) Persons living with each other as if married;

(C) Persons formerly married to each other;

(D) Persons formerly living with each other as if married;

(E) Parents and their adult children;

(F) Other adults sharing common living quarters;

(G) Persons who are the parents of a child but who are not living with each other; and

1. Did the trial court err in allowing the State's expert witness, Carla Thurin, to testify to the credibility and truthfulness of witnesses who have been victims of domestic violence?

2. Did the trial court err in allowing the State's expert witness, Carla Thurin, to testify to the "cycle of violence" associated with domestic violence as said testimony was used by the State as improper character evidence against [Dean]?

The State rephrases the issues like this:

I. Did the district court abuse its discretion when it allowed the State's expert witness, Carla Thurin, to testify about typical victim behavior in domestic violence cases?

II. Did the district court abuse its discretion when it allowed the State's expert witness, Carla Thurin, to testify about the "cycle of violence" in domestic violence cases?

### FACTS AND PROCEEDINGS

[¶ 4] On February 1, 2007, a neighbor of Mrs. Dean called 911 to report a disturbance at the Dean household. The neighbor initially just heard the disturbance (yelling and screaming), but then went to his front door and looked out to see what was going on. He started to walk over to observe the commotion and noted that Mr. Dean had a hold on Mrs. Dean's "hair and she had her hands behind her back like this (indicating) on his hands to prevent her from being pulled." The neighbor started to go over to say something like, "knock it off," but when he saw two men in a car in front of the Dean house, he went back inside and called 911. He was motivated to do so because he did not think "any man or any woman for that matter has the right to physically abuse another human being whether they are married or not." His perception was that Mr. Dean was abusing his wife. He perceived Mr. Dean to be "very angry," and Mrs. Dean appeared to be afraid and was crying.

(H) Persons who are in, or have been in, a dating relationship.

[¶ 5] The police arrived at the Dean household after being summoned by the neighbor's call and they investigated the incident. Cheyenne Police Officer Andy Gutierrez was the principal investigator. Beginning in 2003, Officer Gutierrez's area of investigative expertise was domestic violence calls (Community Advocacy Response Initiative—CARI). He had special training for that assignment and did 12 to 13 such calls a week. Officer Gutierrez was assisted by a volunteer "advocate." Mrs. Dean reported having her hair pulled and that she had a knot on the back of her head, probably from being thrown up against the wall.[2] Mrs. Dean also reported that Mr. Dean threw a cordless telephone at her. She had picked up the phone to call for help and Mr. Dean took it from her and threw it at her as she walked away from him. Testimony from Officer Gutierrez, as well as photographic evidence, documented that the phone had imprinted a telltale red mark (in the shape of a phone) on her left side. A second Cheyenne Police Officer, Dave Padilla, was sent out to the Dean household the day of this battery incident because Officer Gutierrez forgot to take pictures of the bruising left on Mrs. Dean's back by the cordless phone. His testimony also tended to corroborate Mrs. Dean's initial report to the police.

[¶ 6] We will not set out the details of the circumstances that led up to this altercation, other than to note that Mr. Dean had sent his wife flowers and a box of chocolates with a card that said, "I love you." Mrs. Dean was not at work because she had stayed home sick, so Mr. Dean had to have the candy and flowers redirected to her home. At this particular time, Mr. Dean was living with his sister and Mr. and Mrs. Dean had mutually agreed to live apart for a while because they were having marital problems.

[¶ 7] Officer Gutierrez testified that Mrs. Dean reported that shortly after the delivery (between 10:00 a.m. and noon), Mr. Dean arrived and an argument ensued almost immediately. He shoved Mrs. Dean into a chair. When she got up, he slapped her in

2. On cross-examination, Officer Gutierrez testified that he felt Mrs. Dean's head but did not note a bump or any abrasions.

the head. The argument moved into the kitchen where she was pushed into the kitchen stove. She grabbed a knife, but he took it away from her. She then grabbed the phone to call for help and he took the phone from her and then threw it at her a few minutes later. At this point she ran outside the house and was yelling for help, which is about the time the neighbor mentioned above came onto the scene. After Mr. Dean left the scene, the neighbor went over to Mrs. Dean's house and he was still there comforting her when the police arrived. Officer Gutierrez had Mrs. Dean prepare a written statement and she signed it and it was witnessed by the victim advocate who accompanied Officer Gutierrez.

[¶ 8] Officer Gutierrez looked at the booking log and testified that it indicated that Mr. Dean had no injuries when he came to the jail. This incident occurred on Thursday, February 1, 2007, and on the following Monday, Mrs. Dean called Officer Gutierrez and recanted her story, saying that she started the fight. The officer further testified that such recantations occur in "darn near 90 percent" of such cases. Defense counsel followed up on that line of questioning on cross-examination and Officer Gutierrez indicated that in his experience such recantations were never true. With respect to such recantations, Officer Gutierrez explained that: "The stories are very inconsistent with the initial story that is provided. Most of the time they just don't want to lose the relationship. They know if they recant the story they won't be in any trouble." Upon being asked, Officer Gutierrez reported that Mrs. Dean had visited her husband in the jail between February 1, 2007, and the day of her recantation.

[¶ 9] At trial, Mrs. Dean testified and shifted responsibility for the incident from Mr. Dean to herself, saying that she had goaded him into an argument (because he was drunk) and that she was physically abusive to him, but he was not physically abusive to her. She related that she initially told the police what she did because she wanted to get her husband into trouble and because she was afraid she might be arrested if she told

the truth because she had been the aggressor.

[¶ 10] No issue is raised with respect to the sufficiency of the evidence to sustain Mr. Dean's conviction, but we note here that the jury was presented: (1) with the testimony of Mrs. Dean's neighbor, (2) Officer Gutierrez's description of the scene, (4) the photographs which were taken at the scene, and (5) Officer Padilla's corroborative testimony. All of that evidence was pertinent to the finding of guilt the jury made in this case. Mrs. Dean's recantation of her written statement served to exonerate Mr. Dean. Per the Court's instructions to the jury, the core of Officer Gutierrez's testimony, i.e., what Mrs. Dean told him the day of the incident, could only be considered by the jury in judging her credibility. That was also true of Mrs. Dean's written statement which went like this:

On February 1st around 12 noon Trent [Mr. Dean] came to my house drunk and rang the doorbell. I opened it and he started yelling at me. He hit me in my head and threw several objects at me. I picked up a knife to stab him but he took the knife away. I kept screaming and begging for him to leave. Our 3 yr. old daughter was screaming and asking for him to stop and leave. He grabbed the phone when I tried to get it and he broke it. I tried to run to the neighbors to call the police. He ran after me and grabbed me by the hair and pulled me back into the house. He threw me into the chair and the wall. His cousins ran into the house & grabbed him & left.

[¶ 11] The jury was instructed as follows with regard to Officer Gutierrez's testimony and Mrs. Dean's written statement:

Prior inconsistent statements made by Tricia Dean can be considered only for the limited purpose of impeachment of her credibility and may not be considered as substantive evidence of the crime.

You must not consider this evidence for any purpose except the limited purpose for which it was admitted.

[¶ 12] This instruction became the law of the case here, but we question whether it is a correct statement of the law that should have

been applied, i.e., Officer Gutierrez's testimony and Mrs. Dean's prior sworn statement could have been considered as substantive evidence of the crime charged under these circumstances.

[¶ 13]   The only issue raised in this appeal is whether or not the district court erred in allowing the admission of Carla Thurin's testimony. She was called and was qualified as an expert witness with respect to matters involving victims of domestic violence and that they are often motivated to shift blame from the abuser to themselves and to recant when the batterer is facing criminal prosecution.

## DISCUSSION

### [¶ 14]   Standard of Review

▆▆▆   A decision to admit or reject expert testimony rests solely within the discretion of the district court and is not disturbed on appeal absent a clear showing of an abuse of discretion. *Williams v. State,* 2002 WY 184, ¶ 5, 60 P.3d 151, 153–154 (Wyo.2002).

When reviewing matters pertaining to the admission of testimony of expert witnesses, we look to the standard this Court adopted in *Bunting v. Jamieson,* 984 P.2d 467 (Wyo.1999). In that case, this Court adopted the reasoning used by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which has been further clarified as follows:

> The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. Our opinion in *Joiner* [*General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)] makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." 522 U.S. at 138–39, 118 S.Ct. 512, 139 L.Ed.2d 508. That

standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.... Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.

*Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). "In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did." *Campbell v. Studer,* 970 P.2d 389, 392 (Wyo.1998).

> " '[D]ecisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal.' " It is also well established that a district court judgment may be affirmed on any proper legal grounds supported by the record. However, where the law imposes a duty on the district court to make findings on the record, we will not speculate as to the reasons for the decision.

*Bunting,* 984 P.2d at 470 (quoting *English v. State,* 982 P.2d 139, 143 (Wyo.1999)).

A qualified expert witness may testify about scientific, technical, or specialized knowledge if such testimony will help the jury understand the case. W.R.E. 702. This court has adopted the federal *Daubert* model imposing gatekeeping responsibilities on trial courts deciding whether scientific or technical expert testimony is admissible. See *Bunting v. Jamieson,* 984 P.2d 467, 471 (Wyo.1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993)). In doing so, however, we did not "abandon our own precedent regarding the admissibility of expert testimony." *Bunting,* 984 P.2d at 471. Under the *Daubert* model, the trial court must first determine whether the expert's methodology is reliable; then the court must determine whether the proposed testimony "fits" the facts of the particular case. *Id.*

A district court's decision to admit or reject expert testimony is a decision solely within that court's discretion. *Seivewright v. State*, 7 P.3d 24, 29 (Wyo.2000); *Springfield v. State*, 860 P.2d 435, 438 (Wyo.1993); *Betzle v. State*, 847 P.2d 1010, 1022 (Wyo. 1993).

*Cooper v. State*, 2008 WY 5, ¶¶ 9–10, 174 P.3d 726, 728–29 (Wyo.2008) (quoting *Williams v. State*, 2002 WY 184, ¶ 5, 60 P.3d 151, 153–54 (Wyo.2002)).

■ [¶ 15] In addition to this general standard of review, we must also consult our long-standing rule that an expert may not vouch for the truthfulness or credibility of an alleged victim or of any other witness. *Seward v. State*, 2003 WY 116, ¶ 19, 76 P.3d 805, 814 (Wyo.2003).

**Thurin's Testimony Was Not Directed at Mrs. Dean's Truthfulness and It Was Not Improper Character Evidence against Mr. Dean**

■ [¶ 16] No issue is raised as to whether or not Carla Thurin was qualified as an expert in her field or whether or not her testimony was based on her specialized knowledge in an area we have long recognized as appropriate for expert testimony. See *Kenyon v. State*, 2004 WY 100, ¶¶ 21–23, 96 P.3d 1016, 1025 (Wyo.2004); *Skinner v. State*, 2001 WY 102, ¶¶ 17–20, 33 P.3d 758, 764–65 (Wyo.2001); *Ryan v. State*, 988 P.2d 46, 64–66 (dissenting opinions) (Wyo.1999); *Trujillo v. State*, 953 P.2d 1182, 1186–87 (Wyo.1998); and Wyo. Stat. Ann. § 6–1–203 (LexisNexis 2007) (enacted in 1993) and compare *Duran v. State*, 990 P.2d 1005, 1009–10 (Wyo.1999); *Buhrle v. State*, 627 P.2d 1374, 1377 (Wyo.1981); *Frenzel v. State*, 849 P.2d 741, 746–50 (Wyo.1993).

■ [¶ 17] W.R.E. 702 provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." However, the application of that rule must be tempered by W.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."), W.R.E. 404(a) ("Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion[.]"), and W.R.E. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.").

[¶ 18] Thurin's testimony was preceded by this admonition from the trial judge:

Ladies and gentlemen, I need to give you a little bit [of information] about expert witness testimony. There are times in a case when a witness who is not an eyewitness to a case is qualified to provide opinions based on her experience and training and education providing an opinion that would help explain and give you guidance on how to evaluate and receive evidence. Ms. Thurin has been accepted by me as an expert in the area of victims who suffer from domestic violence.

[¶ 19] Prior to their deliberations, the jury was instructed:

A person is qualified to testify as an expert if that person has special knowledge, skill, experience, training, or education sufficient to qualify as an expert on the subject to which the testimony relates.

Duly qualified experts may give their opinions on questions in controversy at a trial. To assist you in deciding such questions, you may consider the opinion with the reasons given for it, if any, by the expert who gives the opinion. You may also consider the qualifications and credibility of the expert.

You are not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be

entitled. You may disregard any such opinion if you find it to be unreasonable.

[¶ 20] Thurin's testimony was relatively brief. It began with an acknowledgement that she did not know Mrs. Dean and that she was not familiar with any part of the instant case. She opined that victims of domestic abuse frequently suffer from low self-esteem and believe they need the abuser to function in their day-to-day life. Many victims who seek help from professionals will not necessarily leave the abuser. Some victims will leave the abuser after a single event, but on average they will be abused seven times before they leave for good.

[¶ 21] Not all domestic abuse consists of beatings and bruising. Instead, many victims are kept isolated and economically deprived and are told that they cannot live without the abuser. They are sometimes threatened with losing their children or finances. Many victims will not go to the police. They will seek social services and they are encouraged to report, but many do not. Many victims grow up seeing abuse between their parents. Alcohol and drugs are often involved in domestic abuse. Infidelity or suspicion of infidelity may be a factor. Ms. Thurin opined that about one in four or five victims will recant a report of abuse. There are many reasons behind recantations (loss of children, finances, a home) but fear is the number one reason—i.e., that the abuser will get them somehow even if the abuser is in custody. Often abusers can "guilt" the victim into visiting the abuser while he (or she, but usually he) is in custody and then convince the victim that the whole thing is really her fault. Victims come to believe that if they had not done "x," "y," or "z" (whatever it might be), then none of this would have happened—I deserved it.

[¶ 22] Ms. Thurin spoke in generalities about the "cycle of violence" but the scenarios she described were not directly pertinent to the facts and circumstances of this case and she qualified her descriptions with the caveat that "every relationship is different."

[¶ 23] Near the end of her testimony, the prosecutor asked Ms. Thurin some questions about "truth telling" by victims of abuse and over Mr. Dean's objections they were answered. Thurin opined that once victims get to a point where they want out of the relationship they will tell the truth. If the victim has a good support system (family, friends, etc.) they are more likely to tell the truth. The primary reason for not telling the truth is fear, and that fear is heightened when the victim must appear in the courtroom with the abuser. In cross-examination, the defense attorney reinforced that the basis for all of Ms. Thurin's testimony was the "average" such case and not the instant case.

[¶ 24] Much of the pertinent case law is summarized by Cynthia Lynn Barnes, Annotation, *Admissibility of Expert Testimony Concerning Domestic–Violence Syndromes to Assist Jury in Evaluating Victim's Testimony or Behavior*, 57 A.L.R.5th 315 (1998 and Supp.2008). At its outset, that annotation recognizes that the cluster of syndromes associated with domestic violence has expanded greatly since it first gained a foothold in the early 1980's. *Id.,* § 2[a] at 330. The annotation also includes cases that hold that prior to the admission of such expert testimony, the proponent of the evidence must establish that the victim is a battered woman or victim of domestic abuse (although generally the expert is not allowed to testify before the jury that the subject of the testimony is a battered woman). *Id.,* § 3[c]. No issue in that regard is raised in this appeal.

[¶ 25] In § 7 of the annotation several cases are discussed which relate directly to the circumstances at hand. We intend to quote from those cases quite liberally because, although the issues raised in this case are quite narrow, they are better understood if those issues are discussed in the broader scope of the subject matter at hand. Moreover, although not raised in this appeal, many of those "other" issues are implicated in this appeal.

[¶ 26] For instance, in the case *State v. Yusuf,* 70 Conn.App. 594, 613–21, 800 A.2d 590 (2002), an expert testified about the battered woman syndrome to aid the jury in understanding the victim's behavior:

Our Supreme Court has held that expert testimony concerning battered woman syndrome is relevant "to describe the behavior

patterns typically ascribed to battered [woman] syndrome." *State v. Borrelli*, 227 Conn. 153, 174, 629 A.2d 1105 (1993).

In the present case, Stark [the expert] testified at length with respect to battered woman syndrome on the basis of his experience with battered women and research into domestic violence. Stark defined "woman battering" as "involv[ing] a course of conduct that includes, but is not limited to, multiple instances of physical abuse or assault and the pattern of isolation, intimidation, mental abuse and control." He indicated that there is a subgroup of battered women, which, as a result of repeated abuse, suffers what he termed a "learned helplessness," which is exhibited "after they [experience] frustration in trying to extricate themselves from the situation or, for whatever reason, they simply [give] up for a period of time, at least, and [believe] that they [cannot] escape from the situation even when there [are] opportunities for them to do so."

. . . .

Stark then described the second part of the syndrome, the "cycle of violence," which "feeds into" the learned helplessness. He explained that in abusive situations, "there [is] a buildup of tension, which [creates] tremendous anxiety and fear on the part of the victim, and then there [is] an episode of physical abuse. . . ." Thereafter, he continued, there occurs what is called "the honeymoon phase" in which the abusive partner apologizes. Stark indicated that it is during that honeymoon phase that a battered woman often is drawn into the relationship because she "desperately [wants] to believe things [will] change, [and she hopes] they might change during this period where the apology or the promises dominate, [and] the battered woman in a sense [gets] sucked into the relationship more deeply than she would have otherwise been; common sense should have told her to leave, but now she's confused . . . [a]nd the result is . . . that she is there when the second episode occurs and possibly the third." Stark testified that at that point, the abuser "may no longer apologize, he may no longer be promising change, but

because of the cycle of violence, she's in some sense entrapped in the relationship and, because of the ongoing abuse, that entrapment leads to . . . learn[ed] helplessness and then, at least for a period of time, [she] is unable to seek help . . . even when it's offered." Such women, Stark explained, "shift their focus from escape, from getting out of the relationship, to merely surviving in the relationship, and they may identify exposing the facts in the relationship to friends or authorities as counter to their interest in surviving either because [the abuser] threatened them with punishment if they report or because they believe at that point, because of the isolation and intimidation, that he has powers which he does not have, in her mind."

During his testimony, Stark also was asked a number of hypothetical questions that tracked the facts that gave rise to the charges against the defendant. Generally, with respect to each hypothetical question, Stark was asked to give his expert opinion whether the hypothetical victim's conduct was consistent with that of a woman suffering from battered woman syndrome. In each case, Stark concluded that the victim's conduct as set out in the hypothetical question was indeed consistent with a woman suffering from battered woman syndrome.

As previously stated, before expert testimony about battered woman syndrome becomes relevant, an evidentiary foundation must first be established that the victim is a battered woman and that her conduct is such that the jury would be aided by expert testimony providing an explanation therefor. See *id.* Here, contrary to the defendant's assertions, we conclude that the state presented sufficient evidence of an abusive relationship warranting the testimony on battered woman syndrome.

The state presented evidence that the defendant battered LeJeune on a number of occasions during the course of their relationship. Stark's testimony was offered to assist the jury in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman. His expert testimony

provided the jury with a relevant insight into LeJeune's behavior that it might not otherwise bring to its evaluation of her credibility. That insight was made more significant in light of the defendant's extensive cross-examination of LeJeune, which focused on her failure to escape from the defendant when she had the opportunity to do so.

Moreover, Stark's testimony was particularly crucial to the jury's determination because although battered woman syndrome has become known to the public more widely than it was in the past, much of the subject still remains beyond the ken of the average juror. Indeed, "[c]ommentators have noted that the research data indicates that potential jurors may hold beliefs and attitudes about abused women at variance with the views of experts who have studied or had experience with abused women. In particular, males are likely to be skeptical about the fear the woman feels in an abusive relationship and about her inability to leave a setting in which abuse is threatened." (Internal quotation marks omitted.) *Id.*, at 167, 629 A.2d 1105. Reliance, therefore, on an expert such as Stark in a case such as this one was well warranted. See *State v. Vega*, supra, 259 Conn. [374] at 393, 788 A.2d 1221 [ (2002) ].

We conclude therefore that the court properly determined that Stark's testimony concerning battered woman syndrome was relevant to assist the jury in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman and to the issue of her credibility.

B

The defendant also claims that the prejudicial effect of Stark's testimony outweighed its probative value. We disagree.

"There are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State v. Battista*, supra, 31 Conn.App. [497] at 515–16, 626 A.2d 769 [ (1993) ]. "The primary responsibility for conducting the prejudicial-probative balancing test rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . We note that [b]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State v. Servello*, 59 Conn.App. 362, 377, 757 A.2d 36, cert. denied, 254 Conn. 940, 761 A.2d 764 (2000).

As we already have concluded, Stark's testimony could have assisted the jury substantially in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman. The court reasonably could have concluded that the probative value of that evidence outweighed its prejudicial effect. We therefore are not persuaded that the court abused its discretion in admitting Stark's testimony, especially in light of the court's limiting instruction to the jury.[FN13]

FN13. In its final charge to the jury, the court instructed in relevant part: "Dr. Stark's testimony presented a general description of battered woman syndrome, and he then testified as to certain characteristics that are commonly found in relationships involving domestic violence and on general or typical behavior patterns of victims of domestic violence. Dr. Stark, however, did not testify about whether Carissa LeJeune was in fact battered or whether her testimony here in court was truthful and accurate. His testimony was offered instead to help you understand whether Ms. LeJeune's conduct was consistent with the pattern and profile of a battered woman to help explain her conduct and thus to aid you in evaluating the credibility of her testimony.

"Expert testimony is presented to you to assist you in your deliberations. No such testimony is binding upon you, however, and you may disregard such testimony either in whole or in part. It's up to you as triers of the facts to determine whether such testimony was credible and whether and how it applies to the case. It's for you to consider the testimony with the other circumstances in the case and using your best judgment determine whether

you will give it any weight and, if so, what weight you will give to it."

C

The defendant's last claim relative to Stark's testimony is that it improperly bolstered LeJeune's credibility and, thus, invaded the province of the jury. We are not persuaded.

There is a "critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility." *State v. Spigarolo*, 210 Conn. 359, 379, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). Expert testimony properly may be admitted to assist the jury in understanding not whether the victim was credible on the witness stand, but whether the victim's conduct was consistent with the pattern and profile of a battered woman. See *State v. Borrelli*, supra, 227 Conn. at 174, 629 A.2d 1105. Such explanatory testimony does not invade the province of the jury in assessing the credibility of witnesses. *Id.* Furthermore, it is not impermissible for an expert witness to respond to hypothetical questions about the behavior of abuse victims for the purpose of establishing that the victim's behavior was generally consistent with that of such victims. See *State v. Freeney*, 228 Conn. 582, 592–93, 637 A.2d 1088 (1994).

In the present case, Stark did not give his opinion as to whether LeJeune testified truthfully or whether she in fact suffered from battered woman syndrome. His expert testimony could have assisted the jury substantially in understanding whether LeJeune's conduct was consistent with the pattern and profile of a battered woman. Moreover, Stark provided the jury with a framework within which it could place and possibly explain the victim's behavior, which is within the accepted role of an expert witness. See *State v. Vega*, supra, 259 Conn. at 396, 788 A.2d 1221.

Our review of the record leads us to conclude, therefore, that Stark's testimony did not invade the province of the jury in assessing LeJeune's credibility, especially in light of the court's limiting instruction to the jury. Accordingly, the court did not abuse its discretion in admitting Stark's testimony. [Some footnotes omitted.]

[¶ 27] In the case *State v. Borrelli*, 227 Conn. 153, 629 A.2d 1105, 1112–16 (1993), which is cited several times in the case immediately above, the appellate court dealt with a case quite similar to the instant case:

In the present case, Stark presented a general description of battered woman's syndrome, based on his experience with battered women and research and study in the area of domestic violence. Stark defined the term "battered woman's syndrome" as referring "to the behavioral and psychological consequences that many victims, but by no means all victims, experience as a consequence of living in domestic violence situations."

Stark explained that there are certain characteristics that are commonly found in relationships involving domestic violence. First, there is the "cycle of violence," in which "there's a period of tension build up in the relationship and then there's what we call the abusive episode where the batter [er] explodes and there's violence maybe combined with other forms of force and harassment . . . and it's at that point or soon after that point that the battered woman may be quite clear about her danger and quite forthright in seeking help. But the next phase is what we call the honeymoon phase or where the batter[er] either says he'll never do it again or . . . enters some kind of treatment program. . . . And she doesn't want the relationship to end, she wants violence to end. And she believes maybe this time it will be different. So at that point she's likely to believe that, in fact, it won't happen again. And she may at that point then either change her story or try to . . . do what she needs to do . . . in order to survive and to feel safe in the relationship."

Stark testified that some battered women develop a "learned helplessness" from repeated failures to take control of the relationship. The result of such learned helplessness is that battered women fail to take advantage of subsequent opportuni-

ties to seek help and escape the battering situation.

Stark also testified: "Now, the battered woman's syndrome includes a lot of behaviors which don't make any sense when you understand them as an outsider, but only make sense when you understand them from the standpoint of survival and safety." Stark testified that battered women may stay in a relationship with an abuser despite the abuse. Battered women commonly fail to report their problems or delay reporting them to the authorities or others. Such women, who have suffered extraordinary harm, commonly minimize or even deny the harm that they have suffered. Finally, there is the "paradoxical situation ... where a woman will come in on one occasion and present a very clear and concise picture of danger that she's in, either explaining it to her health provider or to a police officer, and then a week later completely change her story." Stark testified that this last pattern "is one of the most common things that we see in the field."

Stark's testimony was consistent with the theory of battered woman's syndrome as it has been presented and discussed in scholarly commentary. See L. Walker, The Battered Woman Syndrome (1984) pp. 86–94, pp. 95–104; R. Schuller & N. Vidmar, "Battered Women Syndrome Evidence in the Courtroom: A Review of the Literature," 16 Law & Human Behavior 273, 274–77 (1992); C. Ewing, Battered Women Who Kill: Psychological Self–Defense as Legal Justification (1987) pp. 7–21; see generally L. Walker, The Battered Woman (1979).[FN13]

FN13. The defendant also argues that expert testimony concerning battered woman's syndrome should not be admitted because the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d Ed.1987), an important diagnostic treatise in the medical, psychiatric, and psychological fields, does not contain any reference to the syndrome. Stark specifically disclaimed, however, that the "syndrome" is an illness or mental disorder, but instead testified that battered women are "focusing on survival and safety ... [which] leads to these paradoxical behaviors and attitudes." See *Bechtel v. State,* 840 P.2d 1, 7 (Okl.Crim.App.1992) (rejecting a similar argument and stating that the syndrome is a mixture of both psychological and physiological symptoms but is

not a mental disease); *Commonwealth v. Craig,* 783 S.W.2d 387, 389 (Ky.1990) (syndrome was not mental condition and expert could qualify to testify about it although not a psychiatrist or clinical psychologist); R. Schuller & N. Vidmar, "Battered Women Syndrome Evidence in the Courtroom: A Review of the Literature," 16 Law & Human Behavior 273, 281 (1992) (despite the label, battered woman's syndrome is not a diagnosable mental disorder, but is rather a descriptive term that refers to the effects of abuse on a woman).

Moreover, expert testimony concerning battered woman's syndrome has been accepted by many courts when the testimony was offered by a criminal defendant to bolster a claim of self-defense. See, e.g., *People v. Minnis,* 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 (1983); *State v. Hundley,* 236 Kan. 461, 693 P.2d 475 (1985); *Commonwealth v. Craig,* 783 S.W.2d 387 (Ky.1990); *State v. Anaya,* 438 A.2d 892 (Me.1981); *State v. Kelly* [97 N.J. 178, 478 A.2d 364 (1984)], supra; *Bechtel v. State,* 840 P.2d 1 (Okl.Crim.App.1992); *Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772 (1989); *Fielder v. State,* 756 S.W.2d 309 (Tex.Crim.App.1988). Such expert testimony has also been accepted if offered by the prosecution to explain the recantation of the complaining witness; *Arcoren v. United States,* 929 F.2d 1235 (8th Cir.), cert. denied, 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991); and if offered to explain the victim's delay in reporting the abuse and remaining with the defendant after the abuse. *State v. Frost,* 242 N.J.Super. 601, 614, 577 A.2d 1282, cert. denied, 127 N.J. 321, 604 A.2d 596 (1990); *State v. Ciskie,* 110 Wash.2d 263, 272, 751 P.2d 1165 (1988); see generally J. Schroeder, "Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer," 76 Iowa L.Rev. 553 (1991).[FN14] We conclude that the subject of battered woman's syndrome is "beyond the ken of the average juror," and therefore meets the threshold test for admissibility of expert testimony in this state. *People v. Wilson* [194 Mich.App. 599, 487 N.W.2d 822 (1992)], supra.

FN14. "[P]rosecuting a batterer poses special problems. The battered woman is likely to hide the fact that she is being abused, which results in mate abuse remaining largely unreported.... If charges are filed, the battered woman may change her mind about prosecuting the batterer and with-

draw her complaint, refuse to testify as a witness, or recant." J. Schroeder, "Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer," 76 Iowa L.Rev. 553, 559–60 (1991).

Finally, Stark's expert testimony in this case was helpful to the jury. The most important issue in this case was the credibility of the victim. Her written, signed statement alleged that she had been the victim of egregious abuse. Before the jury, the victim testified that she had not been abused and that indeed it was she who had tied up the defendant and abused him. The defendant, through cross-examination of Olofson, questioned the credibility of the victim's written statement in view of her eighteen hour delay in making the complaint. The victim testified that she had made up the statement in order to get her husband into drug treatment. The state offered a different explanation, one beyond the knowledge and understanding of the average juror-that the statement was true, and the victim's recantation was a pattern of typical behavior consistent with battered woman's syndrome.

In a case directly on point, the Eighth Circuit Court of Appeals upheld the admission of expert testimony on battered woman's syndrome to impeach an abuse victim's recantation at the criminal prosecution of the abuser. *Arcoren v. United States,* supra, 1241. In *Arcoren,* a victim of rape and assault described the defendant's violent sexual and physical assaults to a criminal investigator with the Bureau of Indian Affairs. *Id.,* at 1237. The victim also testified as to the assaults before a grand jury. At trial, however, the victim recanted her prior testimony and denied that the defendant had beaten and raped her. *Id.,* at 1238. The Circuit Court of Appeals noted that, as in the present case, the jury was then "faced with a bizarre situation." *Id.,* at 1240. "A jury naturally would be puzzled at the complete about-face she made, and would have great difficulty in determining which version of [the victim's] testimony it should believe. If there were some explanation for [the victim's] changed statements, such explanation would aid the jury in deciding which statements were credible." *Id.* Like the expert testimony in *Arcoren,* Stark's testi-mony provided the jury in the present case with an explanation for the victim's changed statements.

On the basis of the foregoing, we conclude that Stark was qualified to testify as an expert witness, that his testimony focused on a subject not familiar to the average person and that his testimony was helpful to the jury. Accordingly, his expert testimony was properly admitted.[FN15]

FN15. Of course, expert testimony, like all other evidence, must be relevant to be admitted. *State v. Wade,* 96 Conn. 238, 248, 113 A. 458 (1921). Expert testimony on the subject of battered woman's syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior. *State v. Koss,* 49 Ohio St.3d 213, 218, 551 N.E.2d 970 (1990). In the present case, the defendant has not challenged the adequacy of the requisite foundation, and therefore we need not reach the issue.

C

The defendant's final claim is that the expert testimony in this case was actually opinion testimony as to the credibility of a witness, and therefore should have been excluded because it improperly invaded the province of the jury. The defendant relies on two recently decided cases; *United States v. Whitted,* 994 F.2d 444 (8th Cir. 1993); *State v. Cheeks,* 253 Kan. 93, 853 P.2d 655 (1993); in which convictions were reversed because physician experts testified that, in their opinions, the child victims were in fact sexually abused by the respective defendants. In *Whitted,* the court concluded that the expert testimony, which was based on the victim's subjective version of events, "significantly enhanced [the victim's] believability and unfairly tilted the scales in her favor." *United States v. Whitted,* supra, 447. In *Cheeks,* the expert witness identified a child's crying and defecating as the two forms of behavior most likely to trigger an assault or abuse of a child, and then testified that such behavior was present and was a likely trigger of the abuse in that case. *State v. Cheeks,* 253 Kan. at 103, 853 P.2d 655.

Certainly, the jury had the right to consider Stark's testimony in determining

whether to believe the victim's prior statement or her testimony at trial. Stark did not testify, however, that the victim was in fact battered and therefore did not comment, directly or indirectly, on her credibility.[FN16] Rather, this case is similar to *State v. Spigarolo*, supra, 210 Conn. at 377, 556 A.2d 112, in which we held that a trial court did not abuse its discretion by admitting an expert witness' testimony on the general behavioral characteristics of child abuse victims. We rejected the defendant's claim that the testimony usurped the jury's function of assessing the credibility of witnesses, noting that there is a "critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility." *Id.*, at 379, 556 A.2d 112. In the present case, the purpose of Stark's testimony was to present to the jury possible explanations for why a victim of abuse would completely recant her accusations, explanations that in all likelihood were beyond the jury's experience and knowledge. Stark neither presented opinion testimony as to the credibility of any witness nor indicated whether the out-of-court statement was credible. Like the expert testimony in *Spigarolo*, Stark's testimony was relevant to describe the behavior patterns typically ascribed to battered women's syndrome. The trial court also cautioned the jury that expert testimony "is [not] binding upon you and you may disregard such testimony either entirely or in part. It is for you the triers of the facts to consider the testimony and with the other circumstances in this case, use your best judgment to determine whether or not you give any weight to the testimony and, if so, what weight you will give to it."

FN16. By noting that Stark did not testify that the victim was a battered spouse, we do not imply that such testimony would have implicitly commented on her credibility. Rather, in the context of this case, we need not decide whether an expert witness may offer his or her opinion as to whether a spouse is a battered spouse, nor decide whether such an opinion would implicitly comment on the credibility of the spouse.

Under the circumstances of this case, Stark's expert testimony was properly ad-

mitted "to assist the jury in understanding, not whether [the victim] was a credible witness on the witness stand, but whether her conduct . . . was consistent with the pattern and profile of a battered woman." *State v. Frost*, supra, 242 N.J.Super. at 614, 577 A.2d 1282. We conclude that the expert testimony did not invade the province of the jury in determining the credibility of witnesses.

[¶ 28] In the case *Arcoren v. United States*, 929 F.2d 1235, 1238–43 (8th Cir.1991), the appellate court considered a related issue that again involved a recantation by a victim:

A. As noted, at trial Brave Bird recanted her grand jury testimony. She denied Arcoren raped her, denied that she had seen Arcoren and Bordeaux have sexual intercourse, and stated that the cuts and bruises on her body resulted from an earlier motorbike wreck. When the government confronted her with her contradictory grand jury testimony, Brave Bird stated that she could not remember making the statements or that, where she did recall making them, they were incorrect. She stated that when she made the statements on September 17th accusing Arcoren of raping her, she was angry with Arcoren because "he was with another woman" and not "because he raped [her]."

The government then called an expert witness, Carol Maicky, to testify regarding "battered woman syndrome." She was a psychologist who had worked with battered women for 10 years and with rape victims for 14 years. The government gave the following reasons for offering the evidence:

Your Honor, there are certain facts which the jury has before it from the testimony which we contend will go unnoticed by a lay jury unless put into a perspective by an expert. We're offering her opinion under Rule 702 to show that these particular facts, while [they] may seem insignificant by themselves when put together against a battered women syndrome would allow the jury to determine the credibility of her in court testimony . . . and help them determine which of the two diametrically

opposed sworn statements of Brenda Brave Bird to believe.

After hearing Maicky's proffered testimony in chambers, the court, over defense counsel's objection, admitted the evidence. The court ruled that the evidence was admissible under Rule 702 of the Federal Rules of Evidence because it was "scientific, technical or other specialized knowledge [that] will assist the [jury] to understand the evidence or to determine a fact in issue" and that "the evidence would be more probative than prejudicial." The court, however, warned that Maicky could not "testify as to the ultimate fact that a particular party in this case, not the defendant, the party actually suffers from battered women syndrome. This determination must be left to the trier of fact."

In her testimony before the jury, Maicky generally described the battered woman syndrome. According to her testimony, which was based on her knowledge of the literature dealing with the subject and her professional experience, a "battered woman" is one who assumes responsibility for a cycle of violence occurring in a relationship, where the abuser (a husband or boyfriend) has told her that the first violent episode was her fault. Maicky described the syndrome's general characteristics to include (1) the belief that violence to the woman is her fault; (2) an inability to place responsibility for the violence elsewhere; (3) a fear for her life and the lives of her children; and (4) an irrational belief that the abuser is omnipresent and omniscient. According to Ms. Maicky, a battered woman develops coping mechanisms to deal with the ever-present violence, believing that by doing just one more thing she can stop the violence.

In accordance with the court's direction, Maicky expressed no opinion whether Brave Bird suffered from or displayed symptoms of the syndrome.

B. The district court admitted Maicky's testimony pursuant to Rule 702 of the Federal Rules of Evidence which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony. *See* J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 702[02] at 702–30 (1988). The Advisory Notes to the Rule comment that "[t]he rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.'" Fed.R.Evid. 702, Advisory Note.

Rule 702 is one of admissibility rather than exclusion. *See, e.g., Fox v. Dannenberg,* 906 F.2d 1253, 1256 (8th Cir.1990) ("Rule 702 was intended to function as a broad rule of admissibility."); *Hurst v. United States,* 882 F.2d 306, 311 (8th Cir. 1989) ("A trial court should exclude an expert opinion only if it is so fundamentally unsupported that it cannot help the factfinder."). "[T]he concept expressed by the Rules is sufficiently broad to embrace psychiatric and psychological testimony from those who possess specialized knowledge concerning mental aberrations in human behavior, when such knowledge will help the jury to understand relevant issues in the case." *United States v. Barta,* 888 F.2d 1220, 1223 (8th Cir.1989).

The jury in the present case was faced with a bizarre situation. Immediately after the rapes and assaults, Brave Bird had described them to the police officer whose car she flagged down, to the nurse and the doctor at the hospital where she had gone for treatment, and to a criminal investigator from the Bureau of Indian Affairs. Three days later, she described the rapes and assaults in detail in sworn testimony before the grand jury.

Four months later, at Arcoren's trial, she recanted her grand jury testimony. There she stated that she either did not remember statements to the grand jury or

that, if she did remember them, the statements were incorrect and that some of them were things she had "made up". At trial, she also changed her explanation for the injuries to her leg she had suffered on September 18, 1989. Although she told the police officer, the nurse and doctors at the hospital, and the criminal investigator that Arcoren had inflicted those injuries when he beat her, at trial she testified that the injuries resulted from a motorbike wreck. She also testified that the reason she stopped the police officer after leaving Arcoren's apartment was because she had been driving 70 miles per hour.

A jury naturally would be puzzled at the complete about-face she made, and would have great difficulty in determining which version of Brave Bird's testimony it should believe. If there were some explanation for Brave Bird's changed statements, such explanation would aid the jury in deciding which statements were credible.

Maicky's expert testimony regarding the battered woman syndrome provided that explanation to the jury. As the witness told the jury, the syndrome is a psychological condition, which leads a female victim of physical abuse to accept her beatings because she believes that she is responsible for them, and hopes that by accepting one more beating, the pattern will stop. Maicky's testimony provided the jury with information that would help it to determine which of Brave Bird's testimony to credit. If the jury concluded that Brave Bird suffered from battered woman syndrome, that would explain her change in testimony-her unwillingness to say something damaging against her husband.

Maicky's testimony thus met the requirement of Rule 702 that "a witness qualified as an expert by knowledge, skill, experience, training or education" may testify with respect to "scientific, technical or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." In permitting Maicky to testify, the district court ruled that she was qualified as an expert based on "a degree in psychology from the University of Michigan which is judicially noticed as a respected university plus the length of time of actual experience that she has had in this general field," and that the evidence would be "relevant and probative for the fact finders, the jury," to aid the jury in "pass[ing] upon the veracity or lack of veracity of the wife."

. . . .

Arcoren does not here challenge either the reliability or the general admissibility of battered woman syndrome evidence. Instead, he urges that introduction of such evidence should be limited to cases in which it is offered to bolster a claim of self-defense. There is no persuasive reason, however, for thus limiting it. The standard under Rule 702 for the admissibility of expert testimony is whether the "evidence will assist the trier of fact to understand the evidence or determine a fact in issue." If the expert testimony serves that end, it is immaterial whether the testimony is presented by the prosecution or by the defense. As a New Jersey appellate court stated, in affirming the admission of battered woman syndrome evidence offered by the prosecution, in a case where the wife was the complainant against her husband, "It would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant." See *State v. Frost*, 242 N.J.Super. 601, 612, 577 A.2d 1282, 1287 (Ct.App.Div.1990).

This court has held expert testimony admissible under Rule 702 in other circumstances where the expert's specialized knowledge would assist the jury to understand the evidence. *See, e.g., United States v. Scavo*, 593 F.2d 837, 844 (8th Cir.1979) (bookmaker's statements "virtually incomprehensible to the layman, are fraught with meaning to a person familiar with gambling enterprises"); *United States v. Barletta*, 565 F.2d 985, 991–92 (8th Cir.1977) (conversations conducted in the "peculiar argot of bookmakers" require expert testimony "to be intelligible to the district court"); *see also United States v.*

*Brown,* 776 F.2d 397, 400 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986) (jury assisted by expert's description of "terms and practices" generally used in street narcotics deals); *United States v. Dawson,* 556 F.Supp. 418, 423 (E.D.Pa.1982), *aff'd,* 727 F.2d 1101 (3d Cir.1984) ("[E]xpert testimony is readily admissible to interpret and explain the use of code words and the meaning of certain language used in drug trafficking."). This principle is equally applicable to a situation where a psychologist testifies to "mental aberrations in human behavior, when such knowledge will help the jury to understand relevant issues in the case." *United States v. Barta,* 888 F.2d 1220, 1223 (8th Cir.1989). In this case, Maicky's testimony provided the jury with a basis upon which to understand and evaluate the changes in Brave Bird's testimony.

Arcoren also challenges the admission of Maicky's testimony on the ground that "the jury was in a better position than the government's expert to judge the credibility of Brave Bird." Maicky, however, expressed no opinion on whether Brave Bird suffered from battered woman syndrome or which of her conflicting statements were more credible. Maicky merely provided expert information to aid the jury in evaluating the evidence. Maicky's testimony did not interfere with or impinge upon the jury's role in determining the credibility of witnesses. *See United States v. Provost,* 875 F.2d 172, 175–76 (8th Cir.), *cert. denied,* 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989).

The decision whether to admit expert testimony ordinarily lies within the discretion of the trial court and will not be reversed unless there has been an abuse of discretion. *United States v. Rose,* 731 F.2d 1337, 1345 (8th Cir.), *cert. denied,* 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984). In the unusual circumstances of this case, the district court did not abuse its discretion in admitting Maicky's expert testimony regarding battered woman syndrome.

. . . .

In her grand jury testimony, Brave Bird stated that a year before, on September 22, 1988, Arcoren had hit her with a baseball bat and broken her arm. At trial, she stated that she had not been afraid of Arcoren while she was in the bedroom with him and when she flagged down the policeman. She was then asked whether Arcoren had beaten her with a baseball bat on September 22, 1988. The district court overruled Arcoren's objection to the testimony. When she answered "no," she was confronted with her grand jury testimony that "he broke my arm with a bat back in September of '88," and acknowledged that she "must have" given "that testimony under oath" "if you've got it down."

Arcoren challenges the admission of this evidence as inconsistent with Rule 404(b) of the Federal Rules of Evidence. Rule 404(b) provides that, although "[e]vidence of other crimes, wrongs or acts" is inadmissible to prove a person's character to show action in conformity therewith, it may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In this circuit, for other act evidence to be admissible under Rule 404(b):

(1) the evidence of the other act must be relevant to a material issue; (2) the other act must be similar in kind and reasonably close in time to the crime charged; (3) the evidence of the other act must be clear and convincing; and (4) the probative value of the evidence must not be outweighed by its prejudice.

*United States v. Estabrook,* 774 F.2d 284, 287 (8th Cir.1985).

Rule 404(b) is one of inclusion rather than exclusion, permitting the admission of other act evidence, unless the evidence tends to prove only the defendant's criminal disposition. *United States v. Gustafson,* 728 F.2d 1078, 1083 (8th Cir.), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984); *United States v. Wagoner,* 713 F.2d 1371, 1375 (8th Cir.1983). The district court has broad discretion in determining whether to admit other act evidence, and its determination will be up-

held unless there is an abuse of discretion. *Wagoner*, 713 F.2d at 1375.

One of Arcoren's defenses to the charges relating to Brave Bird was that she consented to sexual intercourse. Evidence that Arcoren hit her with a baseball bat a year before was relevant to that issue, since it suggested that any apparent consent by Brave Bird might have resulted from fear of bodily injury if she resisted. Moreover, since Brave Bird initially denied at trial that Arcoren had hit her, but had testified to the contrary before the grand jury, the evidence also was relevant to the credibility of her trial testimony generally. Arcoren has not shown that the evidence tended to prove only his criminal disposition. The district court did not abuse its discretion in admitting the evidence. *See United States v. Marshall*, 683 F.2d 1212, 1215 (8th Cir.1982).

[¶ 29] We have considered these cases in the light of the facts and circumstances of the instant case and we conclude that the district court did not abuse its discretion in admitting the testimony in controversy.

### CONCLUSION

[¶ 30] Because Ms. Thurin's expert testimony did not purport to vouch for the credibility of Mrs. Dean, nor did it impugn the character of Mr. Dean, we find no error requiring reversal of Mr. Dean's conviction. The judgment and sentence is affirmed.